[Civ. No. 38655. Second Dist., Div. One. May 3, 1972.]

KENNETH APPELGATE et al., Plaintiffs and Appellants, v.
GLEN S. DUMKE, as Chancellor, etc., Defendant and Respondent.

## COUNSEL

Nathan L. Schoichet, A. L. Wirin, Fred Okrand and Laurence R. Sperber for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Acting Assistant Attorney General, Edmund E. White and N. Eugene Hill, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**THOMPSON, J.**—This is an appeal from a judgment of the superior court denying a writ of mandate sought pursuant to Code of Civil Procedure section 1085. We affirm the judgment.

Stated, as it must be, in the light most favorable to the findings of fact of the trial court (*Lynch* v. *Spilman,* 67 Cal.2d 251, 259 [62 Cal.Rptr. 12, 431 P.2d 636]; *Griffith Co.* v. *San Diego Col. for Women,* 45 Cal.2d 501, 508 [289 P.2d 476, 47 A.L.R.2d 1349]), the record reveals the following. In 1968, appellant William Spater was a candidate for a master's degree in art at California State College at Long Beach. The required curriculum for the degree included Art 698, obligating Spater to complete a thesis or an equivalent art project. An unofficial publication of the art department of California State College at Long Beach sets forth the "steps" necessary to obtain a master's degree in art. The portion of that publication entitled "Step VI. Thesis or Project" states: "The Art Department requires that Art 698, Thesis or Project, be completed for a total of six units. . . . All students completing a project for Art 698 are required to exhibit the work done for the project. The procedure for scheduling the exhibit is: 1. Early each semester the Graduate Coordinator in Art, with the assistance of the

Gallery Director, will publish the dates available for graduate project exhibits. 2. By memorandum, the master of arts degree adviser will request that an exhibit be scheduled for the student and will indicate the nature of the exhibit and possible date. 3. The Graduate Coordinator, working with the student, the adviser, and the Gallery Director, will schedule the exhibit and notify all parties of the exact date."

No equivalent of "Step VI" appears in the bulletin of the college which sets forth the official requirements for a master's degree in art. The publication of the art department in which "Step VI" appears is itself not a comprehensive one. The publication requires an "area of specialization" by the candidate for the degree. It states also: "The Department of Art master of arts degree program provides specialization in the following: (1) art education; (2) art history; (3) crafts (areas of: ceramics, crafts, metalsmithing, or textiles); (4) design (areas of: graphic design, display, industrial, interior, or theatre); (5) illustration, printmaking, or drawing and painting." Sculpture is thus not included within the publication's statement of areas of specialization offered by the college.

As part of his academic program leading to a master's degree, Spater enrolled in Art 698. He satisfied the requirements of the course by completing a group of 10 pieces of sculpture. The components of the group consist of 10 life-size nude figures made from plaster and wax. Some of the sculpture depicts sexual and erotic acts, one of which is cogently described by the trial judge as "about an inch away from an act of perversion." The sculpture was completed near the end of the fall semester of the 1967-1968 academic year. On January 8, 1968, Dr. Robert E. Tyndall, Dean of the School of Fine Arts at the college, met with Spater and the members of his graduate committee to discuss whether Spater's project should be exhibited at the college. The committee was asked for its recommendation. Dr. Glenn, chairman of the committee, stated that Spater's thesis had been signed by the members of the committee and that a grade for Art 698 had been released which would enable Spater to receive his master's degree. Dr. Glenn expressed his opinion that Spater had met the requirements for the course but that he did not feel that the committee should recommend for or against a showing. Spater did not object to Dr. Glenn's statement.

A special meeting of the school council was convened on January 25 to discuss the Spater project in particular and the subject of "artistic frankness, the public taste, and the School of Fine Arts" in general. No great enthusiasm was expressed for an exhibition of the Spater project. Immediately after the meeting, Spater told Dean Tyndall that he was anxious to get a "yes or no answer" on the exhibition but that "he did not really

care one way or the other what the answer was." Dean Tyndall concluded that "due to the frankly sexual subject matter of the project and its realistic depiction, it would be inappropriate for there to be an exhibit of . . . [the] . . . project on the campus." By a memorandum dated January 30, he notified Dr. Carl W. McIntosh and Dr. Donald Simonsen, president and academic vice president of the college, that the department of art should immediately release Spater's project to him. Dean Tyndall's decision not to exhibit the project was in accord with a college practice, there having been approximately 10 instances in which no exhibition was held of a student project meeting the requirements of Art 698 although normally the art department staged an exhibition. Dean Tyndall informed Dr. Joseph Krause, chairman, Department of Art, that there would be no exhibition of the Spater project. On February 1, Dr. Krause informed Spater that the project would not be exhibited on campus and that it would be released to him so that he could seek an exhibition elsewhere. Spater was tendered and accepted his master's degree and ceased to be a student of the college in February 1968.

On April 1, Spater and a group of students entered the building where the project was stored and removed it to the lawn area west of the Fine Arts Building number 3. There they set up an unauthorized exhibition of the project surrounding it with a rope or wire guarded by 40 to 50 students. A large crowd gathered. Handbills composed by Spater were distributed identifying the project as having been banned by the college administration. The handouts stated the exhibit would occur "from 8 a.m. until removed" and that Spater treated the unscheduled showing as satisfying all requirements for his master of arts degree. The crowd reached approximately 2,000. Spater and his cohorts had notified the press and television so that the gathering was well covered. The group noisily shouted, jeered, and booed members of the college administration, disrupting instruction in adjoining classrooms. The exhibit was terminated between 10:30 and 11 a.m.

On April 2, Spater delivered a letter to President McIntosh stating: "I wish to appeal the denial of my Master's Exhibit." On April 3, he was notified to remove his sculptures from the campus. On April 15, Spater sought and was granted an extension of time to April 18 to remove the project. On April 19, he notified the college that he had "deeded full ownership and responsibility" for the sculpture to named persons, members of the faculty and staff of the college.[1] A number of persons listed had not

---

[1]The present owners of the sculpture are not parties to the action before us. There is no evidence in the record that they would consent to an exhibition if one were ordered.

authorized the use of their names and did not regard themselves as owners of the sculpture.

A faculty meeting was convened on April 24 to consider the decision not to permit a college-sponsored exhibition of Spater's project. The meeting was interrupted by approximately 150 students. On April 25, the graduate studies committee of the college, to which the matter of the Spater exhibition had been referred by the academic senate, filed its report concluding that a graduate student had no right to an exhibition of his master's degree project and that Dean Tyndall's decision that no exhibition of the Spater project should be sponsored by the college must stand unless officially challenged by the art department.

On April 26, the faculty of the art department convened a meeting and enacted a resolution requesting that the Spater exhibit be held. On May 1, a joint student-faculty meeting was convened to discuss the subject. After the meeting, approximately 150 students embarked upon a protest march to President McIntosh's office where they milled about for 30 minutes refusing to leave while demanding a "last chance" meeting with the president of the college.

On May 2, Dean Tyndall decided to permit the Spater exhibition, limiting persons entitled to view it to students and adults. On May 7, President McIntosh publicly announced that the showing would be held. On May 14, Chancellor Dumke and the chairman and vice chairman of the State College Board of Trustees appeared before the State Senate Rules Committee at its request. They were asked by Senator Hugh Burns, the committee chairman, "to stop the exhibit." The subject of the Spater exhibition was discussed at a meeting of the statewide academic senate of the state college system on May 23. Respondent Dumke, Chancellor of the California State Colleges, and four members of the Board of Trustees reported that it would be difficult if not impossible to display the sculpture in a non-political atmosphere. The statewide academic senate adopted a resolution recommending that Chancellor Dumke not interfere with the exhibit. On May 25, Chancellor Dumke determined that the action of the faculty and administration of the college reversing its prior position and allowing the exhibit was not the result of considered deliberation but had been precipitated by confrontation. He also considered the action erroneous and likely to lead to adverse consequences to the state college system. He therefore announced that the exhibit would not be held at the college.

On May 28, a violent demonstration of about 250 persons occurred at the administration building of the college. The demonstrators demanded

that the Spater project be exhibited and that Chancellor Dumke be ousted. The demonstration escalated on May 29 with the slogan "Spater must show, Dumke must go" to an unlawful assembly resulting in the arrest of 42 students and one faculty member. Most of those arrested were found guilty of unlawful assembly and failure to disperse. The leadership of the demonstrations of April 26, May 28, and May 29 was the same as that of the April 1 lawn exhibit of sculpture for which Spater had prepared the explanatory pamphlet. Nothing in the record indicates that Spater at any time disassociated himself from the demonstrations.

On February 28, 1969, Spater, Kenneth Appelgate, Paul Versailles, and Stephen Werlick filed the petition for writ of mandate which commenced the case at bench. The petition is in three counts. Count I alleges a denial of the right of Appelgate, a professor, and Versailles, a student at the college, to view the Spater projects "in accordance with the usual custom and usage for exhibition of the projects of candidates for the Master of Arts Degree in Art." Count II alleges a denial of the right of Werlick, a professor at the college and a member of Spater's graduate committee, to view the project at the college "in the art setting." Count III alleges a denial of Spater's right to an exhibition of his project. The suit is directed solely against Chancellor Dumke and prays that the court issue its writ of mandate compelling Chancellor Dumke to set aside his ruling barring exhibition of the project.

Respondent filed his answer on April 23, 1969. The answer denies the charging allegations of the petition and asserts the affirmative defenses of Spater's waiver of any right there may have been to a college-sponsored exhibition and the unclean hands of Spater. Appellants, petitioners in the trial court, delayed setting the petition for writ of mandate for hearing until September 18, 1970. On that date, the trial court, after receiving evidence in the form of declarations and depositions from appellants and respondent, considering points and authorities, and hearing argument, denied the petition.

On this appeal from that judgment, appellants contend: (1) respondent, as chancellor of the state colleges, was not empowered to overrule the action taken by the dean of the school of fine arts and the president of California State College at Long Beach permitting the exhibition; (2) respondent abused his discretion by not permitting the exhibit; (3) appellant Spater had a vested right by contract and,as a matter of constitutional protection to an exhibition of his project; and (4) the findings of fact of the trial court are "against the evidence." The contentions are without merit.

## Authority of Chancellor

■ Appellants contend that respondent's action in not permitting the exhibit was "not in discharge of his executive responsibility as the chief administrative officer of the State Colleges; instead he was doing the bidding of the legislative branch of the government through the instrumentality of the State Senate Rules Committee and in the person of its Chairman, Hugh Burns." The contention is not supported by the record or the law.

The trustees of the state colleges are empowered to manage, administer, and control those institutions. They are authorized to adopt rules and regulations for the government of their appointees and of the state colleges. (Ed. Code, §§ 22600, 22604, 23604.1.) They may delegate authority to any officer, employee, or committee. (Ed. Code, § 23605.) Pursuant to their right of delegation, the trustees have ordered that "The Chancellor shall be the chief executive officer of the California State Colleges, and shall have such authority as may be assigned him by the Board of Trustees." (Art. IV, § 1, Rules of Procedure of Trustees.) In Standing Orders, chapter III, section 1, the trustees provide: "The Chancellor shall be the chief executive officer of the California State Colleges and shall have full administrative authority and responsibility. . . ." Chapter IV of those Standing Orders states: "All other officers and employees of the California State Colleges other than those whose duties are defined in the Rules of Procedure, Standing Orders, Administrative Rules or by resolution of the Board of Trustees, shall perform such duties and shall have such powers as the Chancellor shall prescribe."

Appellants point to no rule of procedure, standing order, or resolution of the board of trustees limiting respondent's authority to make the decision he did or placing responsibility for the decision with any other officer, employee, or committee of the state colleges. Absent some special circumstances, respondent, as chancellor of the state colleges, was thus delegated the authority to exercise discretion to permit or not to permit the exhibit of the Spater project despite a contrary decision by subordinate officers administering the affairs of California State College at Long Beach.

No special circumstances appear from the record in the case at bench. We reach no issue of academic freedom or the right of the statewide administration of the college system to interfere with local decisions on strictly academic matters. Appellant Spater, by the unauthorized exhibits of April 1 and his properly inferred participation in subsequent acts of confrontation, had politicized the matter of the exhibit before respondent exercised his discretion not to permit it. With Spater's concurrence, the question of the

exhibition of his project had been removed from the halls of ivy to the streets. The problem was no longer solely one of the academic value of the project to Spater and to those who might view it, but rather concerned the future of California State College at Long Beach and the entire state college system. In that state of affairs, Chancellor Dumke was not only authorized to exercise his power and discretion as the head of the state college system but would have been derelict in his duty had he not done so.

Nothing in the record compels the conclusion that Chancellor Dumke was not exercising his own discretion but "was doing the bidding of the legislative branch of government." The most that the record discloses is that the State Senate Rules Committee had an interest in the problem and that its chairman had requested action banning the exhibit. The trial court was not required to infer from those facts that Chancellor Dumke was blindly acceding to an illegal or unreasonable request. The chancellor was certainly entitled to hear the views expressed by an important committee of the state Senate and would have shown bad judgment indeed had he not done so, while giving due consideration to the views of various faculty, students, and nonstudents.

### Abuse of Discretion

■ Appellants argue also that in any event Chancellor Dumke was guilty of an abuse of discretion in not permitting the Spater exhibit and in overruling the decision of the local college administrators. That argument also is without support in the law or the record.

Far from being arbitrary or capricious, Chancellor Dumke's decision not to permit the Spater exhibit was made upon a substantial factual basis. Spater had publicly declared that the self-help exhibit of April 1, although unauthorized by the college, was satisfactory to him as meeting any assumed right to show the sculpture. Spater had done much to create the problem by initially stating that he cared not whether the project was exhibited. He had exacerbated the problem by his participation in the drafting of the leaflets accompanying the April 1 exhibit. And it could be properly inferred that Spater was a continuing participant in the various demonstrations that followed. Spater had thus participated mightily in a program to politicize what, without his conduct, would have been an academic problem, a program designed to discredit the college whatever decision was made.

Chancellor Dumke's decision did no more than hold Spater to his publicly declared position and recognize that the politics of confrontation

are incompatible with academic freedom. That decision cannot, under the facts here present, be said to be an abuse of discretion.[2]

### Vested Right to Exhibit

■ Appellants contend that both as a matter of contract and as a matter of constitutional law, Spater had a vested right to exhibit his project and the other appellants had the right to view it at the college. The facts of the case at bench do not support the contention.

We do not reach the issue of Spater's contractual right to a college sponsored exhibit of his project[3] nor do we reach the question of the presence of a constitutionally imposed obligation upon the college to permit it.[4] If we assume without deciding that Spater had such a right and the college such an obligation, substantial evidence supports the trial court's determination that Spater waived the right and hence discharged the obligation.

When Spater was informed, prior to his being awarded his master's degree, that there might not be a college-sponsored exhibition of his project, he replied that he did not care whether the answer to the question of exhibiting the project was yes or no so long as there was an answer. When he received the "no" response, he remained quiescent without seeking an administrative redetermination. About two months later, after the degree had been awarded and he had ceased to be a student at the college, he participated in an informal, unauthorized, self-help exhibition of the project on the college lawn, declaring publicly that the exhibition for the period until it was removed satisfied the obligation of the college

[2]There is an indirect complaint in the brief that Chancellor Dumke's action in not permitting the exhibit was taken without notice to Spater or an opportunity to be heard. Spater had been heard previously and had stated he did not care whether or not there was a college sponsored exhibition of his sculpture.

[3]Substantial evidence supports the trial court's determination that Spater had no contractual right to an exhibit. His claim rests solely upon the language of the un-official art department bulletin describing the steps leading to a master's degree. That language imposes no direct obligation on the college to exhibit a project and the art department bulletin is both incomplete in not covering sculpture and in conflict with the official college bulletin which makes no reference to an exhibit as a prerequisite to a master's degree in art. Extrinsic evidence bearing on the ambiguities thus existing was conflicting but resolved against appellants by the trial court.

[4]See *Wirta* v. *Alameda-Contra Costa Transit Dist.*, 68 Cal.2d 51 [64 Cal.Rptr. 430, 434 P.2d 982]; but cf. *Close* v. *Lederle* (1st Cir. 1970) 424 F.2d 988, certiorari denied 400 U.S. 903 [27 L.Ed.2d 140, 91 S.Ct. 141]; *Avins* v. *Rutgers, State University of New Jersey* (3d Cir. 1967) 385 F.2d 151, certiorari denied 390 U.S. 920 [19 L.Ed.2d 982, 88 S.Ct. 855].

to exhibit the work. Spater's admission that the April 1 self-help exhibition was sufficient, taken with the surrounding circumstances, establishes that he waived any right he might have to a formal exhibition. Having waived the right, if any, Spater is in no position to claim on appeal that the right was denied to him.

Spater makes no contention that the waiver was not an intelligent one. The record precludes such an argument. The trial court could properly infer from the entire record that Spater contrived to create a situation in which he would have an unauthorized rather than an official exhibition of the project, accompanied by whatever benefit that might occur to an off-beat artist by having his sculpture banned by the establishment.

The case of appellants Appelgate, Versailles and Werlick can stand on no firmer foundation than that of Spater. While each claims denial of a right to view the project in the setting of a college exhibition, none does or could claim any right to force an exhibition, the right to which was waived by the artist-student.

### Sufficiency of Evidence

Appellants argue that the findings of the trial court "are against the evidence." In support of that argument, they refer only to evidence supporting their position and totally ignore all evidence to the contrary. Thus appellants totally misconceive the function of this court on appeal. While the case at bench was determined in the trial court on the basis of declarations and depositions received in evidence with the consent of the parties, we nevertheless are required to accept the trial court's resolution of conflicts in that evidence. (*Lynch* v. *Spilman, supra,* 67 Cal.2d 251, 259; *Griffith Co.* v. *San Diego Col. for Women, supra,* 45 Cal.2d 501, 508.)

Appellants argue also that some of the evidence offered by respondent was hearsay or conclusionary. The argument fails because no objection to the evidence was tendered in the trial court. The hearsay and conclusionary evidence was thus competent (see Witkin, Cal. Evidence (2d ed. 1966) § 1285, and cases there cited) and entitled to such weight as might be assigned to it by the trial judge.

### Disposition

The judgment is affirmed.

Lillie, Acting P. J., and Clark, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 29, 1972.