**Albert R. PIAROWSKI,
Plaintiff-Appellant,
v.
ILLINOIS COMMUNITY COLLEGE
DISTRICT 515, Prairie State
College, et al., Defendants-Appellees.**

**No. 84–1152.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1985.

Decided April 12, 1985.

Rehearing En Banc Denied
May 10, 1985.

---

Harvey Grossman, Roger Baldwin, Chicago, Ill., for plaintiff-appellant.

John M. Collins, Jr., Cowen, Crowley & Hager, Chicago, Ill., for defendants-appellees.

Before WOOD and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

Prairie State College is a junior college owned by the State of Illinois and located just to the south of Chicago; it has 6,000 students. Albert Piarowski is the chairman of its art department. The president and other top officials of the college, defendants along with the college in this federal civil-rights suit under 42 U.S.C.

§ 1983, ordered Piarowski to remove from a public exhibit in the college three works of art that he had created and was displaying there. He claims that by doing this the defendants (whose action, none deny, was state action) violated his rights under the First Amendment, made applicable to the states by interpretation of the Fourteenth Amendment. After a bench trial, the district court gave judgment for the defendants, and Piarowski appeals. Although the underlying dispute is not rare in the art world, see DuBoff, The Deskbook of Art Law, ch. VIII (1977), we have found only two cases that resemble this. In *Close v. Lederle*, 424 F.2d 988 (1st Cir.1970), an art instructor at a state university, after being invited to exhibit his paintings in a busy corridor, was made to remove them because they were sexually explicit; the First Circuit found no violation of the First Amendment. *Appelgate v. Dumke*, 25 Cal. App.3d 304, 101 Cal.Rptr. 645 (1972), has similar facts, but went off on waiver grounds.

On the main floor of Prairie State College's principal building is a large open area, the "mall." A room 27 feet by 21 feet in size, the "gallery," adjoins the mall near the entrance to the building. No wall separates the gallery from the mall; the gallery is thus an alcove off the mall. A cafeteria, a book store, and a number of other facilities also open onto the mall, and the part of the mall that adjoins the gallery doubles as a student lounge. The mall is the college's main gathering place and thoroughfare; the classrooms are on the upper floors of the same building.

Piarowski and another member of the art department are the gallery coordinators, meaning that they are in charge of arranging art exhibits for the gallery—exhibits of student work picked by members of the faculty, exhibits of the work of outside artists invited by the coordinators, and finally exhibits of art work by members of the faculty. The college has set no criteria for picking works to be exhibited in the gallery, leaving the matter to the coordinators' judgment.

On March 3, 1980, the "Art Department Faculty Exhibition," an annual affair to which the coordinators invite all the members of the department to contribute (there are four full-time members), opened with works by all four members. Each had decided which of his works to exhibit. Piarowski contributed eight stained-glass windows. Five were abstract; three were representational and became the focus of controversy. One depicts the naked rump of a brown woman, and sticking out from (or into) it a white .cylinder that resembles a finger but on careful inspection is seen to be a jet of gas. Another window shows a brown woman from the back, standing, naked except for stockings, and apparently masturbating. In the third window another brown woman, also naked except for stockings and also seen from the rear, is crouching in a posture of veneration before a robed white male whose most prominent feature is a grotesquely outsized phallus (erect penis) that the woman is embracing.

Although when described in words the three stained-glass windows (especially the third) sound pretty obscene, the defendants do not argue that the windows are obscene in the legal sense. The windows are not very realistic; seem not intended to arouse, titillate, or disgust; and are not wholly devoid of artistic merit, or at least artistic intention. They are in the style of Aubrey Beardsley, the distinguished *fin de siècle* English illustrator. Two of Piarowski's windows are imitations of two of Beardsley's illustrations for *Lysistrata*, Aristophanes' comedy, itself sexually explicit, about wives who go on a sex strike in an effort to end the Peloponnesian War. On his deathbed Beardsley ordered his illustrations for *Lysistrata* destroyed as obscene, Weintraub, Aubrey Beardsley: Imp of the Perverse 258 (1976), but the order was not carried out; and though some of the illustrations, with their immense and graphic phalluses, see, e.g., Wilson, Beardsley, pl. 38 (3d ed. 1983), might well be considered indecent even today, the originals are on public display in—with nice irony—the Victoria and Albert Museum. See Weintraub, *supra*, at 199 n. 1. The window with the

phallus is based on a forged Beardsley drawing entitled "Adoration of the Penis."

Piarowski testified that he never intended the women in the windows to be taken to be Negro women; he used brown glass (he said amber, but the women in two of the windows are darker than that) for contrast. The women could, indeed, be taken to be Polynesian rather than Negro (but they are too dark to be Greek). Of course the "Adoration of the Penis" window would not have been less offensive if the man had been dark and the woman light.

The three windows were clearly visible from the mall, and they provoked a number of complaints from students, cleaning women, and black clergymen, though it is not clear that the clergymen actually saw the windows. Prairie State College serves a community in which Aubrey Beardsley is not a household word; almost half the students are night students, three-fourths are part-time rather than full-time students, and the college has no admission requirements. Anyway the exhibit did not mention Beardsley. After ten days the defendants ordered Piarowski to remove the windows. They suggested he exhibit them in a room on the fourth floor (the floor on which the art department's classrooms are located) that in its one year in use as an exhibit room had been used only for exhibiting photography. The room is smaller than the gallery (10 feet by 25 feet) but large enough to hold all of Piarowski's windows and indeed the whole exhibit. Although the room was being used for another exhibit at the time and it appears, though not clearly, that it would not have been free till the summer (the college is in session during the summer), the defendants may not have known that the room was in use—there is nothing in the record on this question. And they may, for all we know, have been willing to move the photography exhibit somewhere else. Their directive to Piarowski left room for counterproposals: "... the three stained glass pieces ... are to be removed from the mall of the college as soon as possible. If you feel that an alternative place for exhibiting these pieces is needed, the gallery on the fourth floor will be acceptable. Thank you for your cooperation." No counterproposals were forthcoming. Piarowski did not even tell the defendants that the fourth-floor room was occupied. Apparently his objection to exhibiting the windows in that room was not that it was unavailable but that it was out of the way and, more important, that the exhibit should not be broken up.

When Piarowski refused to remove the windows, one of the defendants removed them. That was on Friday, March 14. On Monday the art department voted to close the exhibit rather than break it up and it closed two weeks after it had opened, which is to say a week before it was scheduled to close. In retrospect the defendants might have been wiser to have suffered the exhibit to continue intact for another week and have thereby avoided this lawsuit.

■ Piarowski intended no political statement by the content and coloring used in his windows, no disparagement of women or blacks, no commentary on relations between the sexes or between the races. The windows were art for art's sake. But the freedom of speech and of the press protected by the First Amendment has been interpreted to embrace purely artistic as well as political expression (and entertainment that falls far short of anyone's idea of "art," such as the topless dancing in *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932–34, 95 S.Ct. 2561, 2568–69, 45 L.Ed.2d 648 (1975)), unless the artistic expression is obscene in the legal sense. See, e.g., *Miller v. California*, 413 U.S. 15, 34–35, 93 S.Ct. 2607, 2620–21, 37 L.Ed.2d 419 (1973). And if the college had opened up the gallery to the public to use as a place for expression it could not have regulated that expression anyway it pleased just because the gallery was its property, *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983), or because the artist happened to be a member of the college's faculty. Cf. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734,

20 L.Ed.2d 811 (1968); *Knapp v. Whitaker,* 757 F.2d 827 (7th Cir.1985). The artist's status as an employee would give the college more control over his activities than over a stranger's, cf. *id.,* at 842; *McMullen v. Carson,* 754 F.2d 936, 938–39 (11th Cir. 1985); *Clark v. Holmes,* 474 F.2d 928 (7th Cir.1972) (per curiam), but not unlimited control.

█ But the public was not allowed to exhibit in the gallery; unlike the municipally operated theater in *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), where outside producers put on plays for the entertainment of the general public, the gallery was not generally available for outsiders to use to display their work. That Piarowski sometimes invited artists from outside the college to exhibit their work in the gallery no more made the gallery a public forum than a teacher's inviting a guest lecturer to his classroom would make the classroom a public forum. The record is silent on how often the work of outside artists was exhibited. The district judge found that the gallery was never used by outsiders, which is clearly wrong. But Piarowski strays from the record, too, when he says in his brief that outsiders were "regularly invited" to exhibit in the gallery—there just is no evidence of that. Occasional use by outsiders, which is all that this record shows, is not enough to make a college art gallery a public forum. See *Perry Education Ass'n v. Perry Local Educators' Ass'n, supra,* 460 U.S. at 47, 103 S.Ct. at 956.

█ Although *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), held that a state university could not bar religious student groups from its facilities while letting secular student groups use them, the student groups were autonomous; their relationship to the university administration was the same as that of the theatrical producers in *Southeastern Promotions* to the municipal theater. Prairie State College has not given student groups free access to the gallery, and Piarowski is not a student; indeed, as chairman of the art department and gallery coordinator, he is a part of the college administration. Faculty, unlike students, are employees, and it would make nonsense of the concept of public forum to say that because the employees of a public employer naturally have the use of the employer's property, which is where they work, it is a public forum. They are not members of the public.

█ We may assume, however, that public colleges do not have carte blanche to regulate the expression of ideas by faculty members in the parts of the college that are not public forums. We state this as an assumption rather than a conclusion because, though many decisions describe "academic freedom" as an aspect of the freedom of speech that is protected against governmental abridgment by the First Amendment, see, e.g., *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1213, 1 L.Ed.2d 1311 (1957) (plurality opinion); *id.* at 262–63, 77 S.Ct. at 1217–18 (concurring opinion); *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967); *Dow Chem. Co. v. Allen,* 672 F.2d 1262, 1274–76 (7th Cir. 1982); *Gray v. Board of Higher Education,* 692 F.2d 901, 909 (2d Cir.1982); Note, *Academic Freedom in the Public Schools: The Right to Teach,* 48 N.Y.U.L.Rev. 1176 (1973), the term is equivocal. It is used to denote both the freedom of the academy to pursue its ends without interference from the government (the sense in which it used, for example, in Justice Powell's opinion in *Regents of the University of California v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978), or in our recent decision in *EEOC v. University of Notre Dame Du Lac,* 715 F.2d 331, 335–36 (7th Cir.1983)), and the freedom of the individual teacher (or in some versions—indeed in most cases—the student) to pursue his ends without interference from the academy; and these two freedoms are in conflict, as in this case. The college authorities were worried that Piarowski's stained-glass windows, created by the chairman of the college's art department and exhibited in

an alcove off the college's main thorough-fare, would convey an image of the college that would make it harder to recruit students, especially black and female students. If we hold that the college was forbidden to take the action that it took to protect its image, we limit the freedom of the academy to manage its affairs as it chooses. We may assume without having to decide that the college's interest was not great enough to have justified forbidding Piarowski to display the windows anywhere on campus, but it may have been great enough to justify ordering them moved to another gallery in the same building. *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), after all, upheld an ordinance regulating the location of "adult" movie theaters; and the plurality opinion states that sexually explicit though nonpornographic art can be regulated more broadly than political speech. See *id.* at 70, 96 S.Ct. at 2452. It cannot on that account be suppressed altogether; but as *Young* suggests, relocation is not suppression, and if reasonable is not forbidden.

■ This conclusion holds even if we are wrong to think the gallery not a public forum. If it was one, then so was the photography gallery on the fourth floor, and any other room in the main building that would have been suitable for the exhibit; and all together could be viewed as a single public forum for the exhibition of art. A decision as to where within a public forum to display sexually explicit art is less menacing to artistic freedom than a decision to exclude it altogether.

■ The concept of freedom of expression ought not be pushed to doctrinaire extremes. No museum or gallery, public or private, picks the most prominent place in the museum to display those works in its collection that are most likely to offend its patrons; and even though the consequence of its decision is to discourage—though very mildly we should think—the production of art calculated to shock, to outrage, to *épater les bourgeois,* we do not think the decision has constitutional significance. If

Piarowski had given to the man's face in his pastiche of "Adoration of the Penis" the unmistakable likeness of the chairman of the college's board of trustees, we doubt that we would be hearing the argument that the First Amendment prevents any tampering with the siting of a work of art; it would be reasonable in such a case for the college to order the stained-glass window moved to a less conspicuous spot on the campus—especially when the window had been created by an employee of the college, and not just by any employee but by the chairman of the art department and gallery coordinator. Coming closer to the actual facts of this case, if Piarowski had entitled the windows, "Typical Prairie State Coeds," we do not think the college would have been forbidden to order the windows moved to a more discreet location. Or if a member of the art department had submitted such a work of art for display at an exhibit, Piarowski would not have violated the First Amendment by refusing, in his capacity as gallery coordinator, to display it in a conspicuous place. If Claes Oldenburg, who created a monumental sculpture in the shape of a baseball bat for display in a public plaza in Chicago, had created instead a giant phallus, the city would not have had to display it next to a heavily trafficked thoroughfare. The first-floor gallery in Prairie State College's main building is a place of great prominence and visibility, implying college approval rather than just custody, and the offending windows could be seen by people not actually in the gallery. There is no constitutional right to exhibit sexually graphic works of art in a gallery that is missing an outside wall.

■ At argument Piarowski's able counsel conceded that there would have been no violation of the First Amendment if the defendants had put up venetian blinds to screen the gallery from the mall. This concession acknowledges, quite properly in our view, the existence of some scope for a managerial judgment concerning access to sexually frank pictorial art, even a judgment influenced by the offensive nature of

the art. Cf. *Avins v. Rutgers,* 385 F.2d 151 (3d Cir.1967). But we are told that while Piarowski could not have compelled the college to allow him to exhibit offensive art works in the most prominent place of exhibition, once they were exhibited they could not be ordered moved, even to another gallery in the same building; that having delegated the organizing of exhibits in the gallery to Piarowski and another art professor, the college was constitutionally required to forgo any participation in those decisions—even though Piarowski, when forced to decide whether to exhibit his own work, had a potential conflict of interest between his career objectives as an artist and his managerial responsibilities as a gallery administrator.

 Neither the distinction between location and relocation nor the concept of irrevocable delegation is a persuasive ground for reversing the district court. What the parties call the gallery is not to be compared to the National Gallery of Art in Washington, D.C. A room of modest dimensions, it is not even the entire exhibit space of the college, for we know that photographic art is exhibited in a different, although smaller, room on a separate floor. As for the idea that there is a ratchet in play, such that the college could have prevented Piarowski from exhibiting the three stained-glass windows in the gallery in the first place but could not order them removed, we cannot imagine what policy of the First Amendment would be served by making sequence determine outcome. The college authorities did not have to ignore the controversy created by Piarowski's windows. If the college had done nothing it might have been thought to be endorsing the windows by allowing them to be displayed so prominently right off the main thoroughfare, and near the main entrance, of the college. Piarowski's positions as chairman of the art department and gallery coordinator, to the extent known, would enhance the impression of official approval. And while hanging venetian blinds might have limited the audience for the stained-glass windows less than moving them to a less conspicuous exhibition site, we do not think the Constitution requires drawing such fine lines. If the gallery had had two rooms, a front and a back, and the defendants instead of putting up venetian blinds had told Piarowski to move his windows to the back room, the abridgment of free expression would have been trivial. Instead the college had (at least) two rooms, in the same building, suitable for exhibits—only the rooms were not contiguous. The difference between a walk and an elevator ride is not of constitutional dimensions.

If showing Piarowski's work separately from that of the other artists represented in the exhibit might have reduced the exhibit's quality, Piarowski could have suggested moving the entire exhibit to another room, which he did not do. But the premise is in any event dubious. Since the exhibit was simply a group of self-selected works by the members of the department, it is not obvious that it had an artistic integrity to be violated. Piarowski testified that the three objectionable windows were "totally different" from his five other windows (which were abstract rather than representational), although he wanted them exhibited together in order to demonstrate the versatility of stained glass as an artistic medium.

To hold the defendants liable to Piarowski for ordering his work relocated would have disturbing implications for the scope of federal judicial intervention in the affairs of public museums and art galleries. Distinguished public galleries such as the Metropolitan Museum of Art in New York and the National Gallery of Art in Washington would have to worry that if they refused to flaunt their most offensive works of art they might be held to have violated the constitutional rights of artist, donor, or viewer. Nor would it be right to equate Piarowski and the art department to the museum, and the college administrators to a state agency telling the museum what it can and can't exhibit, and where. The gallery was a single room in the college. Piarowski was no more its proprietor than a junior curator at the Metropolitan Museum of Art is the proprietor of the

displays he arranges. It cannot be right that if any authority whatever is delegated to a curator, the owner of the museum—the college in this case—is helpless to correct the curator's errors of taste. The precept that in museum management "good taste is the first refuge of the witless," Museum of the City of New York, Explorations of the Ways, Means, and Values of Museum Communication With the Viewing Public 53 (1969) (remarks of Harley Parker); but see Burcaw, Introduction to Museum Work 177 (1975), is not yet engraved in constitutional law.

We emphasize that the college did not offer Piarowski the fourth-floor gallery as an alternative site on a take-it-or-leave-it basis, and may not have known it was already occupied. The college was apparently open for counterproposals, but none were forthcoming. The idea of venetian blinds—even of a disclaimer of college sponsorship or endorsement—was not forthcoming. Piarowski did not tell the defendants that the fourth-floor gallery was occupied, which might have caused the defendants to rethink their edict of removal, especially since the exhibit had only 10 days left to run when the storm arose. Common sense tells us that the chairman of the art department must have known better than anyone else in the college which if any alternative sites might be acceptable to show his art; and if none were acceptable, he should have said so, and did not. He seems to have been more interested in becoming a martyr to artistic freedom than in finding another room in the building to exhibit his work, or persuading the defendants to back off by demonstrating to them the absence of any reasonable alternatives, though we hesitate to conclude that he waived his First Amendment rights like the artist in *Appelgate v. Dumke, supra.*

This is an easier case than *Close v. Lederle, supra,* where the issue was removal, not relocation, though there was a finding there, and not here, that children used the corridor in which the offensive art was hung. If the defendants had said to Piarowski, you cannot exhibit such work anywhere on campus, Piarowski might have been discouraged from creating similar work in the future; for Prairie State College is the most natural site for a member of its art department to exhibit his work. The discouragement is much less, and hence the abridgment of freedom of expression is less, when the college says to him, you may exhibit your work on campus—just not in the alcove off the mall. Although this location maximized the artist's audience, the impact, both on his incentive to create controversial works of art and on the accessibility of those works to the viewing public, of moving it to another place (and we do not mean the broom closet) in the same building would have been slight.

*Sefick v. City of Chicago,* 485 F.Supp. 644 (N.D.Ill.1979), which questioned *Close* en route to invalidating the revocation by the City of Chicago of permission to display sculptures in the lobby of a city building, is distinguishable from the present case both because the motive for revocation was political (the sculptures satirized the city's mayor) and because the issue, as in *Close,* was removal rather than relocation. Not every trivial alteration of the site of an art exhibit—not every modest yielding to public feeling about sexually explicit and racially insulting art—is an abridgment of freedom of expression.

When we consider that the expression in this case was not political, that it was regulated rather than suppressed, that the plaintiff is not only a faculty member but an administrator, that good alternative sites may have been available to him, and that in short he is claiming a First Amendment right to exhibit sexually explicit and racially offensive art work in what amounts to the busiest corridor in a college that employs him in a responsible administrative as well as academic position, we are driven to conclude that the defendants did not infringe the plaintiff's First Amendment rights merely by ordering him to move the art to another room in the same

building. The judgment of the district court dismissing the complaint is therefore AFFIRMED.