# United States Court of Appeals
## For the First Circuit

No. 12-1472

JOHN NEWTON; DONALD BERRY; JOAN BRAUN;
NATASHA MAYERS; ROBERT SHETTERLY;

Plaintiffs, Appellants,

JONATHAN S.R. BEAL,

Plaintiff,

v.

PAUL LEPAGE, in his capacity as Governor of the State of Maine;
JOSEPH PHILLIPS, in his capacity as Director, Maine State Museum;
RICHARD J. WINGLASS, in his capacity as Commissioner of the Maine
Department of Labor;

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin, Circuit Judge,
and Woodlock,[*] District Judge.

Jeffrey Neil Young, with whom Carol J. Garvan, Jonathan
S.R. Beal, and McTeague Higbee were on brief, for appellants.
Paul Stern, Assistant Maine Attorney General, with whom
William J. Schneider, Maine Attorney General, and Sarah A. Forster
were on brief, for appellees.

---

[*] Of the District of Massachusetts, sitting by designation.

November 28, 2012

**LYNCH**, <u>Chief Judge</u>.  The question presented is whether the governor of Maine violated the First Amendment by removing a large state-owned mural, commissioned by the former administration, from its location on the walls of a small waiting room for visitors to the Maine Department of Labor ("MDOL").  The governor's initial stated reason was that he agreed with complaints that the mural did not convey a message of evenhanded treatment toward both labor and employers and so the mural was inappropriate for that particular setting at MDOL.  At the same time, he said the mural would be placed into a different public building, the Portland City Hall.  Later, the governor added that he objected to the mural's remaining at the MDOL location because the mural had been paid for from government funds which would better have been used for the state unemployment fund.  To be clear, the governor's stated objections were to the location of the mural on the MDOL walls; he stated the mural would be reinstalled in another building.

Whatever the wisdom of the decision to remove the mural from that location, the accountability for that decision lies in the political process.  The district court correctly entered judgment for defendants on plaintiffs' claims of a First Amendment violation.  <u>Newton</u> v. <u>LePage</u>, 849 F. Supp. 2d 82 (D. Me. 2012).

I.

In 2007, the administration of Maine Governor John Baldacci commissioned Judy Taylor, a Maine painter, to produce a

-3-

mural for the small public waiting room of the MDOL's offices in Augusta. The sign on the waiting room stated:

Maine Department of Labor
Commissioner of Labor
Employment Service
Rehabilitative Services
Labor Standards (Safety Works)
Unemployment Compensation
Administrative Hearings
Center for Workforce
Research and Information

Contested administrative workers' compensation hearings between employers and employees were held in the offices, as well as other activities. MDOL rented these offices in a privately owned building that also housed the offices of private entities.

Under the contract between MDOL and Taylor, MDOL paid Taylor $60,000 for a "Maine Labor Mural" consisting of "panels depicting selected episodes in the history of Maine labor" whose "permanent location" was the "Department of Labor, Augusta, Maine." The mural appears to be about six feet high and thirty feet long spanning two walls. The contract provided that "[o]fficial sole ownership [by the state] of the work occurs when a letter of final acceptance is sent by the contracting agency to the artist," and that:

> The work will be placed in the location for which it was selected. The contracting agency agrees that the artist and the Commission will be notified if, for any reason, the work has to be removed or moved to a new location. The artist and the Commission have the right to advise or consult with the contracting agency or its designee regarding this treatment of the work.

-4-

The contract plainly contemplated that the mural could be shown in a different location and the artist's consent was not required.

The mural was paid for using both Maine and federal funds from the federal Reed Act, 42 U.S.C. § 1103 (regarding employment security funds); the Bureau of Labor Standards; the Bureau of Rehabilitation Services; the Center for Workforce Research and Information; and the MDOL Overhead account in the Commissioner's Office. The mural was not funded by Maine's public arts program, the Percent for Art program,[1] and was not a Percent for Art project.

On August 9, 2008, the completed mural was installed in an anteroom at the MDOL where visitors typically waited before meetings with MDOL staff. The mural contained panels which depicted a shoemaker teaching an apprentice, child laborers, women textile workers, workers casting secret ballots, the first Labor Day, woods workers, the 1937 shoe strike in Lewiston and Auburn, labor reformers, women workers during World War II, the 1987 strike at the International Paper Mill in Jay, and the future of Maine labor. Next to the mural was a plaque stating:

> Judy Taylor
> History of Maine Labor
> Oil Paint Mural, Eleven Panels

---

[1] The state Percent for Art program requires agencies constructing public buildings or facilities other than schools or correctional facilities to spend at least 1% of money appropriated or allocated for construction by the Maine Legislature on works of art. 27 Me. Rev. Stat. tit. 27, § 453(1).

2008
Commissioned for the Department of Labor and
Administered by the Maine Arts Commission
"building Maine communities through the arts"

The waiting room measures twelve feet by twenty-six feet in area. The mural covered two contiguous walls above a knee wall. Three sides of the waiting room are lined with nine chairs, and on the fourth side is a receptionist behind a security window. The waiting room also, at the time the mural was present, displayed a framed 19th century pamphlet urging employers to oppose the passage of a child labor bill. It, too, was later removed.

Inside the MDOL offices, but not in the waiting room, there were framed pictures in the "Frances Perkins" conference room, nearly all of which depicted Perkins.[2] There were no bulletin boards or other locations for members of the public to post materials in the MDOL waiting room or in the corridor leading to it.

---

[2] Perkins, who had strong family roots in Maine and returned to a family homestead in Maine virtually every summer of her life, was appointed Secretary of Labor by President Franklin Roosevelt in 1933, becoming the first female Cabinet member. See Dictionary of American Biography 607-10 (Supp. VII 1981). The five pictures displayed in the "Frances Perkins" conference room were: (1) a copy of a newspaper article profiling Perkins from the 1930s; (2) a photo of Perkins with President Roosevelt; (3) a drawing of the Triangle Shirtwaist Fire by Clinton Kamp; (4) a photo of Perkins; and (5) a copy of a Time magazine cover featuring Perkins and a postcard of Perkins. When announcing the removal of the mural, the acting Commissioner of the MDOL also stated an intention to rename the conference room.

On January 5, 2011, Paul LePage was sworn in as Governor of Maine. One of his advisors, John Butera, had visited the MDOL waiting room before January of 2011 on business and considered the mural to be overwhelming, pro-labor, and anti-business. On February 28, 2011, the Office of the Governor received an anonymous letter complaining that the mural was "propaganda" meant to further the union movement and asking Governor LePage to take the mural down. The governor's press secretary, Adrienne Bennett, also stated that several unnamed business officials had complained about the mural.

On March 22, 2011, Laura Boyett, the Acting Commissioner of MDOL, sent an email to MDOL staff stating that:

> We have received feedback that the administration building is not perceived as equally receptive to both businesses and workers -- primarily because of the nature of the mural in the lobby and the names of our conference rooms. Whether or not the perception is valid is not really at issue and therefore, not open to debate. If either of our two constituencies perceives that they are not welcome in our administration building and this translates to a belief that their needs will not be heard or met by this department, then it presents a barrier to achieving our mission.
>
> I will be seeking a new home for the mural and we will be renaming the conference rooms in our administrative office at Commerce Drive in Augusta.

Word of the removal reached the media. On March 22, 2011, Taylor learned from a reporter about Governor LePage's intention to remove the mural. Later that week, Adam Fisher, the communications

director for MDOL, telephoned Taylor and informed her that the mural was going to be removed.[3]

On March 23, 2011, Dan Demeritt, a spokesperson for Governor LePage's administration, stated, as to the plans to remove the mural, that "[t]he message from State agencies needs to be balanced" and that "we were merely looking to achieve a little aesthetic balance." On March 24, 2011, press secretary Bennett stated that "[t]he Department of Labor is a state agency that works very closely with both employees and employers, and we need to have a décor that represent[s] neutrality."

On March 25, 2011, the governor issued a press release saying:

> Without workers and employers, we do not have an economy. Maine's Department of Labor needs to serve and balance the interests of both employees and employers to accomplish its mission. I encourage anyone with artwork that celebrates the cooperation that exists in Maine's workplaces to consider offering it for display at any Department of Labor or Career Center Location.
>
> I appreciate the effort and talent Ms. Taylor devoted to the creation of her mural as well as the important history it represents. I am pleased that her work of art will be prominently displayed in Portland City Hall, the site of Maine's first State House. (emphasis added).

---

[3] During this call, Taylor neither agreed nor disagreed with the removal of the mural from its original location. Taylor's affidavit stated that "I am concerned about how the mural panels are being stored, how they were taken down, and how the removal may impact their condition," but she did not otherwise state that she opposed the mural's removal.

-8-

Appellees represented at oral argument that the mural has not yet been reinstalled elsewhere because of the pendency of this litigation.

In a radio program, Governor LePage stated that "I'm trying to send a message to everyone in the state that the state of Maine looks at employees and employers equally, neutrally and on balance. The mural sends a message that we're one-sided, and I don't want to send that message." The governor ordered the mural removed based on the complaints he had received and on his own perception that the mural was a one-sided portrayal of labor history, not acceptable to business interests.

On March 27, 2011, the mural was removed from the MDOL offices. The framed 19th century pamphlet urging employers to oppose the passage of a child labor bill was removed at the same time; the pamphlet was later returned to its donor upon his request. Bennett released a statement on March 28, 2011, explaining that "[t]he mural has been removed and is in storage awaiting relocation to a more appropriate venue."[4]

_____

[4] On May 16, 2011, a Maine Deputy Attorney General wrote to Taylor explaining that "[t]he mural has been carefully placed in crates made of birch wood. The mural is being stored in a safe, secure, climate-controlled room. . . . At this time, no final decision has been made regarding where the mural will be displayed. The present litigation has placed that decision on hold, and we will not be finalizing that decision until the litigation has concluded."

On September 26, 2011, after the removal of the mural had provoked controversy, Governor LePage was interviewed and asked whether he was opposed to organized labor. In reply, he stated "[m]y objection to the mural is simply where the money came from. The money was taken out of the unemployment insurance fund which is dedicated to provide benefits to unemployed workers. They robbed that account to build the mural. And until they pay for it, it stays hidden." Governor LePage stated that the mural's removal was not because of any depiction of organized labor; indeed, he stated he came up through organized labor.

During an interview in October of 2011, Governor LePage stated that:

> The Mural can go right back up tomorrow if they pay the money that was used from the unemployment funds. If the money is paid back, they can put it any place they want, any time they want. But they took money from funds that were not appropriate.

On September 28, 2011, press secretary Bennett issued a press release stating that:

> The Administration originally removed the mural because of its messaging. The mural portrays only one party that the Department of Labor serves -- workers not job creators. In order to change the culture the decision was made to find a more appropriate location for the mural. It was then discovered how the mural was funded and that these funds could have been put into the Unemployment Trust Fund for Mainers to benefit from. When the Governor learned of this it further supported the decision.

This court has no information on whether there is now anything on the walls of the waiting room. A fuller description of the facts

-10-

is contained in the district court's thoughtful opinion.  See Newton, 849 F. Supp. 2d at 86-112.

## II.

On April 1, 2011, plaintiffs John Newton and five others filed a complaint in the U.S. District Court in Maine against Governor LePage and the Commissioner of MDOL, now Robert Winglass, and Joseph Phillips, the Director of the Maine State Museum. Appellants are five[5] Maine residents who had viewed the mural and planned to view it again at the MDOL offices.  They claimed that the mural's removal "was impermissibly content- and viewpoint-based."  There was a contingent claim that the failure to conduct a hearing before removing the mural violated plaintiffs' procedural due process rights.[6]  That issue is not pursued on appeal.

## III.

Our review on First Amendment cases is de novo as to ultimate questions of law and mixed conclusions of law and fact. Ridley v. MBTA, 390 F.3d 65, 75 (1st Cir. 2004).  "Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the

---

[5] One plaintiff before the district court, Jonathan S.R. Beal, is not a party on appeal.

[6] Plaintiffs also asserted two state-law claims: a claim for breach of fiduciary duty against Phillips, and a claim seeking review of governmental action pursuant to Me. R. Civ. P. 80C.  The district court declined to exercise supplemental jurisdiction over these claims and dismissed them without prejudice on March 23, 2012.  See Newton, 849 F. Supp. 2d at 130.

constitutional threshold." Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 511 (1984).[7] Our review of the appellants' First Amendment claim "carries with it a constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court." Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Bos., 515 U.S. 557, 567 (1995). Further, all of the facts needed to decide this question are not disputed and none of the facts appellants say are disputed are material to the legal questions. In particular, appellants do not dispute that the State has represented that it will relocate the mural and they have not provided evidence -- as opposed to speculation -- to show that this representation will go unexecuted.

IV.

The usual initial question in claims of violation of rights is whether the plaintiffs are the right parties to bring the challenge. Appellees deny appellants have standing. As in Griswold v. Driscoll, 616 F.3d 53, 56 (1st Cir. 2010), we think the better course is not to attempt to disentangle the questions of whether there is standing and whether there is a cognizable First Amendment claim, and to dispose of the two issues together.

---

[7] "We must 'make an independent examination of the whole record,' so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 285 (1964) (citation omitted) (quoting Edwards v. South Carolina, 372 U.S. 229, 235 (1963)).

While the mural is itself not speech, the First Amendment protects artistic as well as political expression, unless that artistic expression is legally obscene, Miller v. California, 413 U.S. 15, 23 (1973).  This is not a case in which the government seeks to regulate the speech of private parties, the classic problem to which the First Amendment is addressed.  See People for the Ethical Treatment of Animals, Inc. v. Gittens, 414 F.3d 23, 29 (D.C. Cir. 2005).  Nor is it a case in which the government seeks to compel a private individual to personally express a message with which he disagrees or is compelled by the government to subsidize such a message expressed by a government advertising campaign.  See Johanns v. Livestock Mktg. Ass'n, 544 U.S. 550 (2005).

Rather, this is a case about private citizens attempting to compel a governor to keep in place a mural, owned by the state, in a particular location, the MDOL offices.  They argue the relocation is not a neutral time, place, and manner restriction but is viewpoint-based discrimination.[8]  See Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 332 n.10 (1st Cir. 2009).

It is quite clear that the MDOL waiting room cannot be called a public forum in any of the iterations of that doctrine.

---

[8]  The appellants concede that a decision to remove the mural from its location based on reasons not motivated by viewpoint discrimination would not violate the First Amendment.  Rather than explore the law governing mixed motives, we treat the appellants' primary objection that the initial reason constituted viewpoint discrimination.

It is not a traditional public forum, nor a designated forum, nor a limited forum. See Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 469-70 (2009); Sutliffe, 584 F.3d at 333-34.[9] The small waiting room is not an art gallery, nor an exhibition space, nor a library, nor an exercise in broadcasting. Nor is it a space open to the public for demonstrations of political or expressive activity. The waiting room also was not in a university or college and there is no claim, nor could there be, of issues of academic freedom. Further, the case concerns the relocation of the art from this particular setting to another location, not the permanent removal of the mural from all public view.

Both sides rely on the "government speech" doctrine as described in Summum, 555 U.S. at 467-81, and Johanns, 544 U.S. at 560-67. Appellees say this mural is plainly government speech and so there are no First Amendment concerns about its relocation at all. The fact that the waiting room was of a government agency which also owned the mural does not foreclose a First Amendment claim. See Piarowski v. Ill. Cmty. Coll. Dist. 515, 759 F.2d 625, 628 (7th Cir. 1985) (Posner, J.).

Appellants argue the test for whether the mural is government speech is whether a person in the waiting room could

---

[9] The public forum analysis has been much criticized. See Summum, 555 U.S. at 478-80; United States v. Am. Library Ass'n, Inc., 539 U.S. 194, 205-06 (2003); Ridley, 390 F.3d at 75-76; Frederick Schauer, Principles, Institutions, and the First Amendment, 112 Harv. L. Rev. 84, 97-100 (1998).

have reasonably understood the mural's views to be those expressions of the artist and not of the government. They do concede in their briefs that some have interpreted the mural as conveying a pro-labor message. Appellants also argue that, even assuming the mural's speech is government speech, the decision by the governor necessarily was viewpoint discrimination. At oral argument they added that they do not have to show there was some form of public forum created.

We need not reach so broadly. These formulations of the issues fail to capture myriad relevant factors under First Amendment law, and are insensitive to the variety of factual combinations which may arise. We see no reason to adopt an "either/or" test -- that either the mural represents the artist's speech or it is the government's speech. It is not the mural standing alone which is at issue, but what the mural's presence in the MDOL waiting room signified. The message the government did not wish to portray, of non-neutrality, came from the particular location of the mural; the government did not have an objection to an alternative location.

The mural's prominence, filling two walls of a small waiting room, alone would easily lead viewers to understand that the government's location of the art there was an endorsement of the mural's message, even if the expression originated with the

artist. That is particularly so, given the plaque identifying the work as being commissioned by the MDOL and paid for by the state.

The government, without violating the First Amendment, may, in this setting, choose to disassociate itself from an endorsement implicit from the setting for the mural, which it reasonably understood as interfering with the message of neutrality the administration wishes to portray. This is so whether the mural is anti-labor or pro-labor. It is well established, in a number of contexts, that maintaining the appearance of neutrality is a sufficient government justification.[10] Lehman v. City of Shaker Heights, 418 U.S. 298, 304 (1974) (plurality opinion); Sutliffe, 584 F.3d at 331-32; Ridley, 390 F.3d at 92-93. Many cases recognize that the government must have some discretion as to the choice of art it puts on the walls of its offices, even where the government is acting as an arts patron. It has discretion to make aesthetic judgments, with which some will agree and others will disagree. Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 585-86 (1998); Gittens, 414 F.3d at 29-30.

Circuit courts have routinely rejected First Amendment claims brought against government officials who have chosen to remove art works, offensive to some but not others, from the walls of working government institutions on the grounds they were

---

[10] We do not suggest that if this were treated as government speech neutrality would be required. Summum, 555 U.S. at 467-68.

inappropriate to that location. Further, the law clearly gives governments leeway to take into consideration the problem of the captive audience and complaints it has received from those who viewed the art work while visiting government offices for other reasons. See Close v. Lederle, 424 F.2d 988 (1st Cir. 1970) (no First Amendment violation from the removal by the University of Massachusetts of certain offensive but not obscene art work from a corridor frequented by students). As Judge Aldrich said in Close, the defendants "were entitled to consider the primary use to which the corridor was put." Id. at 990. The defendant officials were also entitled to consider the complaints they had received, and even if there had been no complaints, they were "warranted in finding the exhibit inappropriate to that use." Id.; see also Piarowski, 759 F.2d at 630-31 (no First Amendment violation where college chose to remove from walls artwork whose prominence and location implied college approval and not just custody); Ill. Dunesland Pres. Soc'y v. Ill. Dep't of Natural Res., 584 F.3d 719 (7th Cir. 2009) (no First Amendment violation when state park decided not to display certain items on display racks).

The same is true of relocation of art work by the federal government. See Serra v. U.S. Gen. Servs. Admin., 847 F.2d 1045 (2d Cir. 1988) (removal of Richard Serra sculpture, commissioned by GSA for a federal plaza, and relocation, after complaints, does not violate First Amendment). In Serra, the court stated that "the

Government's action in this case is limited to an exercise of discretion with respect to the display of its own property" and that "nothing GSA has done here encroaches in any way on Serra's or any other individual's right to communicate." Id. at 1049.

Nor is there any violation of the First Amendment from the fact that a newly elected administration chooses to convey a different message than that conveyed by the administration it replaced. See Advocates for Arts v. Thomson, 532 F.2d 792 (1st Cir. 1976) (decision by government to cancel a program is editorial in nature and not a First Amendment violation); Muir v. Ala. Educ. Television Comm'n, 688 F.2d 1033 (5th Cir. 1982) (en banc) (editorial decision by government-controlled licensee to cancel a program was not censorship under First Amendment).

Finally, we reject appellants' attempt to shoehorn this case into a school library case such as in Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico, 457 U.S. 853, 871-72 (1982). Not only do appellants overread Pico, but school libraries are plainly distinguishable from the MDOL waiting room. See Griswold, 616 F.3d at 56 (curriculum guide better analogized to curriculum than school library); Muir, 688 F.2d at 1044-45 (broadcast stations distinguishable from school libraries).[11]

---

[11] In a final argument on appeal, appellants urge we adopt what has been called the hybrid speech doctrine, citing American Civil Liberties Union of North Carolina v. Conti, 835 F. Supp. 2d 51 (E.D.N.C. 2011). We have not adopted the doctrine and see no need to discuss it here.

V.

It is clear that the government speech doctrine favors the result we reach, as was also true in Griswold. See Summum, 555 U.S. at 467-68 (government is entitled to select the views it wishes to express). As Justice Stevens has noted, the government speech doctrine is "recently minted." Id. at 481 (Stevens, J., concurring); see also Griswold, 616 F.3d at 59 n.6 (describing government speech doctrine as "still at an adolescent stage of imprecision"). Indeed, it is a bit odd to say that this mural reflects government speech when the present administration says it does not wish the MDOL offices to be associated with an implicit message of non-neutrality. This is, in fact, an easier case for the government than Summum. Here, unlike Summum, the issue does not involve a public park, nor does it involve the government's decision whether or not to accept a private donation. 555 U.S. at 466. It is also clear that no Equal Protection or Establishment Clause concerns are raised by this case. This case does not involve the suppression of private speech.

At oral argument, appellees again committed to the showing of the mural elsewhere. They said it may now be placed in different places around the state "because this is now the most famous piece of art in the state of Maine."

There are those who disagree with the decision to remove the mural from the MDOL. Governors and administrations are

-19-

ultimately accountable to the electorate through the political process, which is the mechanism to test disagreements.  See Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 235 (2000); Sutliffe, 584 F.3d at 331 n.9.  As Judge Posner has noted, to hold the defendants liable to a plaintiff artist (or a viewer) "for ordering [the] work relocated would have disturbing implications for the scope of federal judicial intervention in the affairs of" other institutions, including public museums. Piarowski, 759 F.2d at 631.

Affirmed.