# United States Court of Appeals
## For the First Circuit

No. 09-2002

THEODORE GRISWOLD, ET AL.,

Plaintiffs, Appellants,

v.

DAVID P. DRISCOLL, ETC., ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf,  U.S. District Judge]

Before

Boudin, Circuit Judge,
Souter, Associate Justice,[*]
and Howard, Circuit Judge.

Harvey A. Silverglate, with whom Norman S. Zalkind, David
Duncan, and Zalkind, Rodriguez, Lunt & Duncan LLP were on brief,
for appellants.
William W. Porter, Assistant Attorney General, with whom
Martha Coakley, Attorney General, and David Guberman, Assistant
Attorney General, were on brief, for the appellees.

August 11, 2010

[*]    The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SOUTER**, **Associate Justice**.  The issue is whether a decision by the Commissioner of Elementary and Secondary Education of Massachusetts to revise an advisory "curriculum guide" (by deleting his own earlier revision) in response to political pressure violated the First Amendment.  We hold that it did not and affirm the judgment of the district court.

The well-pleaded facts in the plaintiffs' complaint, taken as true, see Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortgage Fin. Corp., 246 F.3d 1, 4-5 (1st Cir. 2001), together with documents attached and cited, see Stein v. Royal Bank of Canada, 239 F.3d 389, 392 (1st Cir. 2001), tell the following story.  A 1998 Massachusetts statute required the State Board of Elementary and Secondary Education to "formulate recommendations on curricular material on genocide and human rights issues, and guidelines for the teaching of such material."  1998 Mass. Acts 1154.  The law instructed the Board to "consult with practicing [educators], as well as experts knowledgeable in [such] issues" and provided a non-exhaustive list of topics for possible consideration, including the "Armenian genocide."  The final product was to be "filed" with legislative officials "not later than March 1, 1999," and made "available to all school districts in the commonwealth on an advisory basis."

On January 15, 1999, the Commissioner, appellee David Driscoll, circulated a draft of the "Massachusetts Guide to

-2-

Choosing and Using Curricular Materials on Genocide and Human Rights Issues" to members of the Board for review and comment. The Commissioner is "the secretary to the board, its chief executive officer and the chief state school officer for elementary and secondary education," but he is subject to the Board's authority, being removable by a majority vote. Mass. Gen. Laws ch. 15, § 1F. Driscoll's draft Guide explicitly referred to "the Armenian genocide," provided references to a number of relevant teaching resources, and stated by way of "background information" that the "Muslim Turkish Ottoman Empire destroyed large portions of its Christian Armenian minority population" in the late nineteenth and early twentieth centuries.

Four days after the draft Guide circulated, a local Turkish cultural group asked Driscoll and the Board to revise the Guide to present what they considered to be a more "objective study of history" by including references to the "contra-genocide perspective," according to which the fate of Ottoman Armenians did not reflect a policy of genocide. This group (along with others representing different constituencies) also addressed the Board at a public meeting held on January 26.

As a consequence, a number of changes were made to the Guide, including the addition of citations to several resources arguing the contra-genocide thesis and the deletion of the

background information.[1]   The revised version of the Guide was submitted to  legislative officials on March 1, 1999, as the statute directed.  Driscoll's cover letter indicated that the Board had reviewed the Guide and voted to accept it at the January 26 meeting.[2]

Attempts to change the Guide did not stop.  In June, representatives of Armenian descendants in Massachusetts asked the governor in a letter to remove references to pro-Turkish sources, and before the month was out, Driscoll issued a second revised version of the Guide.[3]  This new revision was shorn of "all references to Turkish websites, except for [that of] the Turkish Embassy," in what the plaintiffs describe as an "obviou[s]," if incomplete, attempt to "appease the political opposition to anything appearing to be 'Turkish.'"  In response to the

---

[1]  A section of the Guide recommending "Selected Print Resources for Teachers and High School Students" was also removed. This section had recommended five resources in "Armenian Studies."

[2]  The complaint alleges that the Board "voted to adopt the Guide, as presented [at the January 26 meeting] with certain alterations."  But recommendations for the additional contra-genocide references were not made until the next month.  It therefore appears that specific references added to the revised Guide were not reviewed by the Board but were rather simply later approved by Driscoll.

[3]  This final version of the Guide is dated simply "June 1999," making it unclear whether the final revisions were made before or after the June 12 letter to the governor.  Nevertheless, the plaintiffs allege that Driscoll "acted in response to political pressure" by the Armenian group, a state politician who had written to the Board in February (before the revised Guide with the contra-genocide references was filed), and the governor.

predictable complaint from Turkish groups, Driscoll and the Chairman of the Board, appellee James E. Peyser, replied that the legislative language required the Board to "address the Armenian genocide and not to debate whether or not [it] occurred." They took the position, accordingly, that the Guide could not refer to any source calling the genocide into question, including the previously listed website of the Turkish embassy.

The most recent version of the Guide instructs that "[c]urriculum, instruction, and classroom assessment about genocide and human rights issues should be based on factual content aligned with the material in the Massachusetts Curriculum Framework." It lists relevant "main topics" from the History and Social Science Framework, and "subtopics" including the "Armenian Genocide." The Guide advises that "[a]lthough some [relevant] information . . . is contained in textbooks, teachers wishing to explore these topics must find further information from other sources," and it concludes with a list of organizations, presumably intended as possible sources. The list includes The Children's Museum in Boston, Amnesty International, and the United Nations. Several Armenian groups are listed; no Turkish organization is.

The appellants, a collection of students, parents, teachers, and the Assembly of Turkish American Associations (ATAA, one of the Turkish groups that had complained to Driscoll), filed this suit in 2005. Their complaint alleged that revisions to the Guide made after its submission to legislative officials (that is,

-5-

the removal of the contra-genocide references) violated their First Amendment rights to "inquire, teach and learn free from viewpoint discrimination" (in the case of the students and parents) and to speak (in the case of the ATAA, whose website was removed from the revised Guide). The district court dismissed the complaint. The court first held that ATAA's claims were barred by the applicable three-year statute of limitations, see Poy v. Boutselis, 352 F.3d 479, 483 (1st Cir. 2003), because the alleged violation of its rights occurred in 1999 when its website was removed from the Guide. The district court then held that the Guide was a form of government speech and, as such, exempt from First Amendment scrutiny. The court understood this conclusion to resolve overlapping questions of both the individual plaintiffs' standing and the merits of their constitutional challenge. We affirm the district court, although our reasoning differs slightly at times.

First, we agree with the district court that ATAA's suit is time-barred. ATAA does not claim a right to have its website included in the Guide; it says, rather, that the website, once included, could not be "excised to further a political agenda." The allegedly unconstitutional action therefore occurred in 1999 when the website was removed. The appellants' subsequent refusal to take further action to reverse that decision establishes neither an ongoing policy and practice nor an independent act of "excis[ion]." Cf. Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 131-32 (1st Cir. 2009).

Second, as for the issue of individual plaintiffs' standing, we see this as a case in which the dispositive questions of standing and statement of cognizable claim are difficult to disentangle. See McConnell v. FEC, 540 U.S. 93, 227 (2003), overruled on other grounds, Citizens United v. FEC, 130 S. Ct. 876 (2010); Warth v. Seldin, 422 U.S. 490, 500 (1975). If one sees the complaint as pleading a First Amendment library claim that may or may not ultimately be supported by evidence about the curriculum guide, the opportunity for a distinct analysis of standing is clear. But we think the equally straightforward reading is that of a curriculum guide claim that should be treated like one about a library, in which case pleading cognizable injury and stating a cognizable claim resist distinction. We therefore think it prudent to dispose of both standing and merits issues together.

The briefing and argument have urged two competing metaphors upon us, with contrasting constitutional implications: that the Guide is a virtual school library established for the benefit of students as well as teachers; and its contrary, that the Guide is an element of the curriculum itself. While neither figure of speech fits exactly, we think classification of the Guide as part of the state curriculum is the better choice.

The library metaphor, if accepted, would subject the decision to remove the references to contra-genocide material to First Amendment review under Board of Education, Island Trees Union Free School District No. 26 v. Pico, 457 U.S. 853 (1982). There,

-7-

a local board of education instructed the school superintendent to cull certain books from high school and junior high school libraries under circumstances suggesting that the order was based more on patriotism and religion than educational suitability. Students brought an action claiming that the mandated removal interfered with a First Amendment right of access to ideas free of interference from political pressure exerted through administrative authority above the school level. Id. at 857-59 (opinion of Brennan, J.). A fragmented majority affirmed an appellate order that the case proceed to trial, contrary to the district court's award of summary judgment to the board of education. A plurality concluded that a school board could not remove books from a library for the purpose of denying students access to ideas unpopular with board members, and found the question of the board's motivation for the removal order (viewpoint politics vs. education quality) to be a triable fact issue. Id. at 869-75. Pico's rule of decision, however, remains unclear; three members of the plurality recognized and emphasized a student's right to free enquiry in the library, id. at 863-69, but Justice Blackmun disclaimed any reliance on location and resorted to a more basic principle that a state may not discriminate among ideas for partisan or political reasons, id. at 878-79, and Justice White concurred in the judgment without announcing any position on the substantive First Amendment claim, id. at 883-84. But whatever special consideration is due to claims of library censorship, that issue need not be resolved here, for

even on the assumption that some version of the plurality view is good law, this case would not fit within the plurality's scheme of library protection.

So far as it appears from the Pico opinions, books in the school library were chosen by someone at the particular school, but in any event not by the school district's board of education. See id. at 860 (opinion of Brennan, J.) (noting that one judge on the Second Circuit panel "treated the case as involving an unusual and irregular intervention in the school libraries' operations by persons not routinely concerned with such matters" (internal quotation marks omitted)). The pressure to remove the books considered offensive was exerted through the board against the schools through procedures that might have been "highly irregular and ad hoc," id. at 875; that is, the schools were overruled by superior administrative authority, in what appeared to be a substitution of the customary process for determining school library content. See id. at 874 (noting allegations that the board "ignored . . . the views of librarians and teachers within the . . . [s]chool system [and] the advice of the Superintendent of Schools" (internal quotation marks omitted)). It is this fact of improper interference from above that raised the specter of "official suppression of ideas," id. at 871 (emphasis omitted), and

may also explain, in part, the plurality's distinction between removal and acquisition of library books, see, e.g., id. at 862.[4]

Here, the administrative structure through which external force was brought to bear was different. We may assume for argument that the Guide might be considered as a library of sorts and that the political leverage exerted by the Armenian groups was equivalent to the pressure brought by the parent group upon members of the school board in Pico. See id. at 856. But the missing step is the decisive act by a superior official overruling the authority that determines content in the normal course (in this case, the Board). According to the allegations, the governor and a state senator high-handedly channeled the reaction of the Armenian groups, but the revision dropping the contra-genocide references was made by the same authority that included them earlier, the Commissioner (and, moreover, appears to have been made before the Guide was made available to school districts).[5]

---

[4] Of course, the Pico plurality did not suggest that all school board interference with library collections would be improper. To the contrary, the plurality acknowledged that "local school boards have a substantial legitimate role to play in the determination of school library content," and it identified several "criteria that appear on their face to be permissible" bases for school board action, "educational suitability, good taste, relevance, and appropriateness to age and grade level." 457 U.S. at 869, 873 (internal quotation marks omitted). Pico provides no ground for calling into question school board decisions to remove library books based on such criteria, even if the decisions are made through unusual procedures.

[5] The plaintiffs allege that Commissioner Driscoll's decision to delete the contra-genocide references was never voted on by the Board, but this fact does not distinguish it from the initial

-10-

Hence, to find a First Amendment entitlement by these plaintiffs would be a quantum extension of even the three-judge portion of the Pico plurality, regardless of any doctrinal effect of Justice Blackmun's or Justice White's concurrences. We would have to hold that any compliant response to an expression of political opinion critical of a school library's selection of books would violate a First Amendment right to free enquiry on the part of library patrons, and even if we limited such a rule to pressure exerted by political office-holders, we would be acting beyond any arguable authority of Pico.

Of course, merely calling the plaintiffs' position a leap from Pico and leaving it at that would beg the question whether we should take the leap, but Pico addresses that issue in its explicit proviso that, howevermuch discretion may be limited in the instance of the library, where "the regime of voluntary inquiry . . . holds sway," a school board "might well defend [a] claim of absolute discretion in matters of curriculum by reliance on their duty to inculcate community values." Id. at 869. Although the extent of political autonomy in setting curriculum is not spelled out any further in Pico, the seriousness of the plurality's reservation of

decision to include the references. See supra n.2. Further, even if the Board had approved the initial addition of the references, the Commissioner is not the Board's boss (in fact, he is answerable to the Board), a fact that precludes any inference that the Board's original action was overridden in some way outside the authorized or normal course in which source materials for teaching are recommended by the state government.

-11-

curricular autonomy free of review by a court for viewpoint discrimination is underscored by three strands of Supreme Court case law.

The first emphasizes the role of public schools in the "preparation of individuals for participation as citizens, and in the preservation of the values on which our society rests," Ambach v. Norwick, 441 U.S. 68, 76-77 (1979) (collecting cases); see also Bethel Sch. Dist. No. 403 v. Fraser 478 U.S. 675, 681 (1986). The second acknowledges that "[s]tates and local school boards are generally afforded considerable discretion in operating public schools," Edwards v. Aquillard, 482 U.S. 578, 583 (1987), and that federal courts "do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values," Epperson v. Arkansas 393 U.S. 97, 104 (1968). And the third is the developing body of law recognizing the government's authority to choose viewpoints when the government itself is speaking. See, e.g., Pleasant Grove City v. Summum, 129 S. Ct. 1125 (2009).

When it comes to judicial supervision of school curriculums, all three lines point in the same direction and against extending the Pico plurality's notion of non-interference with school libraries as a constitutional basis for limiting the

discretion of state authorities to set curriculum.[6]  Here there is no denying that the State Board of Education may properly exercise curricular discretion, and the only question on the motion to dismiss is whether the pleadings allow for any doubt about the status of the Guide as an element of curriculum.  We think they do not.

There are only two apparent arguments against treating the Guide as curricular, that is, as a component of the specifications that inform teachers about what to teach.  First, although the Guide describes itself as one for "choosing and using curricular materials," the Board has made it available for viewing by students.  But though students have access to the Guide (and its text at one time spoke of it as referring to resources for "students" as well as teachers),[7] the overwhelmingly obvious point

_____

[6] We find our decision against extending Pico here to be in line with the positions taken by at least two other Courts of Appeals.  See Chiras v. Miller, 432 F.3d 606 (5th Cir. 2005) (textbook selection); Downs v. L.A. Unified Sch. Dist., 228 F.3d 1003 (9th Cir. 2000) (content of school bulletin board).  In both of those cases, the courts viewed the speech at issue as government speech.  We need not decide that the Guide is government speech to resolve this case, but we think that while the doctrine is still at an adolescent stage of imprecision, see Summum, 129 S. Ct. at 1139 (Stevens, J., concurring) (describing it as "recently minted"), it would run counter to the thrust of Supreme Court authority and our own recent decision in Sutliffe v. Epping School District, 584 F.3d 314 (2009) (town website is government speech), to extend Pico's even less precise rule to the drafting and revision of school curriculums.

[7] The draft version of the Guide contained a section dedicated to "selected print resources for teachers and high school students."  That section does not appear in subsequent versions, including the one submitted to legislative officials in March 1999.

-13-

of the Guide is to provide teachers with a framework and sources of materials for teaching "genocide and human rights issues" as a subpart of the existing curriculum, for which no standard text or anthology is assumed to be available or sufficient. Thus, the Guide instructs that "[i]t is to be used in conjunction with" the pre-existing curriculums for history, social science and language arts and it highlights relevant portions of those curricular specifications. The fact that students also have access to the Guide and may use it as a resource on their own does not make it any less part of the curriculum. In fact, as the Guide points out, all Massachusetts curricular frameworks are on the Department of Education's website.

The second objection to the Guide's classification as curriculum lies in its failure to claim consistently that it occupies the entire field of legitimate source material. Although instruction is supposed to be "aligned" with a framework that speaks of genocide, supra at 5, the terms of the Guide allow teachers to look beyond it, and its directions to sources with a particular point of view are not meant to declare other positions out of bounds in study or discussion. It also speaks, in other words, in keeping with open enquiry, which is the object of a general library collection. But the disclaimer of exclusiveness, even considered alone, does not untie the Guide from its curricular purpose; it merely leaves the Guide saying in effect that, "This is a good place to look when you flesh out topics in the state

-14-

curriculum relating to genocide and human rights issues." The appellants' argument, if adopted, might actually have the effect of foreclosing future opportunities for open enquiry in the classroom. A ruling in their favor might induce school boards to limit the permissible materials for teaching any subject likely to generate heat, simply to foreclose suits under Pico when they modified references or specifications later. (The other alternative, of course, would be never to make changes, but we do not see the prospect of curricular ossification as any more comforting.) Regardless, a non-exclusive guide to teachers does not resemble a covert library whose shelves limit how far its intended student patrons can range around on their own, and there is no apparent reason to treat the Guide's open-ended character as entailing a limit on the Commonwealth's discretion to modify it.

The revisions to the Guide after its submission to legislative officials, even if made in response to political pressure, did not implicate the First Amendment. The judgment of the district court is affirmed.

**So ordered.**