JERRY E. SMITH, Circuit Judge,
dissenting:
This is a jurisprudentially difficult case that can be conscientiously decided in a number of different ways. The majority has chosen a respectable approach: Applying a “reasonable observer test,” it reverses a summary judgment for the state after holding that Texas’s specialty license plates are not “government speech.” Though I agree with much of the cogent and well-written majority opinion, I do not discern a “reasonable observer test” in the applicable caselaw and am also unable to distinguish Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). Because I would therefore affirm the summary judgment, I respectfully dissent.
I.
The majority correctly rules that we have jurisdiction to hear this matter, though I would not describe Hibbs v. Winn, 542 U.S. 88, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004), as “open[ing] the doors to federal courtfs] where the [Tax Injunction Act (“TIA”)] might otherwise bar the suit” or as an “exception” to the TIA. Winn merely draws the contours of the TIA, holding that it does not apply where the plaintiff is not seeking to “enjoin, suspend or restrain” the collection of state taxes. That is the situation here, where plaintiff Texas Division, Sons of Confederate Veterans (“SCV”) wants the state to collect taxes, and in Winn, in which the plaintiff wanted to compel Arizona to collect taxes, as contrasted with the situation in Henderson v. Stalder, 407 F.3d 351 (5th Cir.2005), in which the plaintiff wanted to enjoin Louisiana from collecting assessments on license plates. Winn does not provide an “exception” to the TIA’s bar; if a plaintiff seeks to “enjoin, suspect or restrain” the collection of taxes, Winn would provide him no avenue for relief in federal court.
Moreover, I concur that the state has engaged in viewpoint discrimination: The reason it refused to allow SCV’s license plate was that it objected to the pro-Confederate Flag design. I therefore agree that unless the government-speech doctrine protects the state’s decision to refuse to produce the plate, SCV would be entitled to relief. I disagree with the majority, however, that the government-speech doctrine does not encompass Texas’s decision as to what messages to accept on its license plates. The “reasonable observer” test is not an accurate reflection of discerned law but, instead, manifests an understandable desire to create a plain, quotable test.
II.
The “reasonable observer test” cannot be discerned from the law, though the majority is in good company, given that some of our sister courts have adopted it. The majority announces the “reasonable observer test” after analyzing Johanns v. Livestock Marketing Association, 544 U.S. 550, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005), and Summum, but neither decision can be explained by way of that test, and neither provides it. Livestock Marketing, as the majority acknowledges, was resolved by way of an “effective control” test. The Supreme Court was not opaque in its reasoning: The reason that government-speech doctrine encompassed ostensibly private ads for the beef industry was that the ads were “from beginning to end the message established by the Federal Government,” despite the major role played by private actors in crafting them. Livestock Marketing, 544 U.S. at 560, 125 S.Ct. 2055.
*402 Summum is of little more help to the majority, which logically must bypass large swaths of that opinion, inflate one portion of it, and ultimately morph Justice Souter’s lone concurrence (and his dissent in Livestock Marketing) into law. Citing ipse dixit from the Fourth Circuit, the majority states that Summum “shows that the Supreme Court did not espouse a myopic ‘control test’ in [Livestock Marketing ].” It is not obvious how the majority or the Fourth Circuit reaches that conclusion. According to the majority, Sum-mum “did not base its holding on [the city’s] control over the permanent monuments. Instead, its conclusion focused on the nature of both permanent monuments and public parks.” From that characterization, the majority inaccurately reimag-ines Summum as a “reasonable observer” case.
Summum did discuss the association between public parks and governments, but that was only one portion of an opinion that emphasized “effective control” just as much, if not more:
[T]he City has ‘effectively controlled’ the messages sent by the monuments in the Park by exercising ‘final approval authority’ over their selection. [Livestock Marketing ], 544 U.S. at 560-561, 125 S.Ct. 2055. The City has selected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent the Park; it has taken ownership of most of the monuments in the Park, including the Ten Commandments monument that is the focus of respondent’s concern; and the City has now expressly set forth the criteria it will use in making future selections.
Summum, 555 U.S. at 472-78, 129 S.Ct. 1125.
The fairest reading of Summum is that the Court emphasized a variety of aspects of the public park and saw all of them to weigh in favor of finding government speech. Depending how we count them, the Court gave about half a dozen reasons why the city was entitled to judgment but without attempting to mint any “test,” and it is a demonstrable misreading of Sum-mum to pigeonhole it as providing otherwise.
The only Justice who favored of a “reasonable observer” test was Justice Souter, and even he does not seem to believe that that test is the law in the wake of Sum-mum. Sitting as a circuit judge after Summum, Justice Souter — rather than believing that Summum manifested a coalescence around his twice-proposed test (despite that no Justice joined his concurrence in Summum) — described the post-Summum government-speech doctrine as “at an adolescent stage of imprecision.” Griswold v. Driscoll, 616 F.3d 58, 59 n. 6 (1st Cir.2010) (Souter, J.) (emphasis added).
Perhaps more poignantly, the “reasonable observer” test demonstrably contradicts binding caselaw. In Livestock Marketing, the Court — again, applying an “effective control” test — held that television advertisements for the beef industry were government speech. What would a reasonable observer have seen when watching those ads? He would have seen the familiar trademark “Beef. It’s What’s for Dinner.” And he would have seen the message “Funded by America’s Beef Producers,” the logo for the “Beef Board,” and a checkmark with the word “BEEF.” Livestock Marketing, 544 U.S. at 554-55, 125 S.Ct. 2055. Nowhere would the ad have given any indication that the federal government had anything to do with this industry advertisement.
If a “reasonable observer” test were the law, then Livestock Marketing was incorrectly decided. That is why Justice Sout *403 er, espousing the “reasonable observer” test for the first time, dissented in that case.
As for Summum, several, if not all, of the privately donated monuments bore some inscription indicating the donor. For example, the Ten Commandments monument (the monument that triggered the suit) bore the mark of the Fraternal Order of Eagles and a prominent statement authored by the order that the display was presented by it to the city; the order maintained the monument and took steps to ensure that its inscription remained visible. If the court were only asking whether a “reasonable observer” would see private speech when looking at the monuments, why would that reasonable observer not have concluded that the Ten Commandments monument was the speech of the Fraternal Order of the Eagles? [1]
The same goes for Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), which involved restrictions on federal funding for “family-planning services” and which prohibited physicians from receiving grants under a federal program (“Title X”) from counseling patients on abortion “as a method of family planning.” Against a First Amendment challenge, the Court upheld Title X as a permissible exercise of the government’s policy preferences in favor of life and against abortion, despite that the ostensible speaker is the physician, not the government.
Finally, in Chiras v. Miller, 432 F.3d 606 (5th Cir.2005), a pre-Summum case, we held that the state’s selection and use of textbooks in public schools was government speech, notwithstanding that a reasonable observer would also attribute the speech to several private actors: the authors, publishers, and editors of the textbooks. In short, it is not reasonably possible to reconcile the “reasonable observer” test with existing caselaw.
A final comment: The reasonable observer test would bless the government’s behavior in any case involving viewpoint discrimination so long as it made it clear enough that the government is endorsing the speech that remains in the forum. How can it be that the law would provide a test that, by its terms, would allow the government an easy mechanism to shut down speech in any forum on any topic it wants? Undoubtedly, courts would still routinely condemn viewpoint discrimination, no matter how clearly the government indicates to third-party observers that it is engaging in the censorship. But what that should reveal is that the “reasonable observer test” is not the law.
III.
The majority properly notes that five courts of appeals have expounded on the applicability of the government-speech doctrine to license plates.[2] The majority understandably emphasizes that all but *404 one have held government-speech doctrine inapplicable.[3] But the landscape is more complicated than that.
None of those circuits meaningfully negotiates Summum. That is unsurprising, given that only one of their decisions postdates Summum. And even that opinion was issued less than a month after Sum-mum, relegated Summum to a footnote, and rejected its relevance summarily.[4] Yet, Summum makes the instant question more difficult than such treatment would suggest.
SCV conceded at oral argument that, despite its repeated admonitions that the (near) harmony of our sister courts’ judgments should weigh heavily on our own, we are the first court meaningfully to consider the applicability of Summum to these facts. I address that now.
A.
Pleasant Grove City, Utah, has a 2.5-acre public park in its historic district that contained fifteen displays, at least eleven of which were donated by private groups or individuals. The monuments included, among other things, a Nauvoo Temple Stone (an artifact from the Mormon Temple in Nauvoo, Illinois, donated by John Huntsman), a Pioneer Water Well donated by the Lions Club, a Pioneer Granary donated by “the Nelson family,” a September 11 monument donated by the Eagle Scouts, and — most relevant to the dispute in Summum — a Ten Commandments monument donated by the Fraternal Order of the Eagles in 1971. Several, if not all, of the privately donated monuments bore some inscription indicating the donor. For example, the Ten Commandments monument (which was the monument that, according to the plaintiffs, manifested Pleasant Grove’s viewpoint discrimination) bore the mark of the Fraternal Order and a prominent statement authored by the order that the display had been presented by it to the city. The order maintained the monument and took steps to ensure that its inscription remained visible.
Summum, a religious organization, twice wrote to the mayor requesting permission to erect a stone monument containing the “Seven Aphorisms of SUMMUM,” similar in size and nature to the Ten Commandments monument; the city rejected the request. Summum sued under 42 U.S.C. § 1983, claiming that the city was engaged in viewpoint discrimination by accepting a Ten Commandments monument but not Summum’s religious monument.
The Court held that when the city decided which private monuments it would accept and install in the park, the city was itself speaking, even if it was joining the company of private speakers. Because the city was speaking for itself, the First Amendment were irrelevant, and dissenters could not force the city to accept monuments that it did not wish to have in its park. What is striking about Sum-mum is just how much one can analogize almost every salient fact there to the facts here.
B.
1.
First, the Court noted that all parties in Summum had agreed that if “a monument *405 ... is commissioned and financed by a government body for placement on public land,” the monument would undoubtedly “constitute[ ] government speech.” Summum, 555 U.S. at 470, 129 S.Ct. 1125 (describing this statement as an “obvious proposition”).[5] The Court then held that the result did not change just because the monuments were privately financed and donated in final form:
Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land. It certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated.
Id. at 471, 129 S.Ct. 1125. The same can be said of Texas’s specialty license plates, which are made, owned, and sold by the state,[6] which also owns the intellectual property in those plates and does not permit owners to bear plates other than its own.
Just as Pleasant Grove invited or allowed private actors to submit possible monuments for placement in its parks, Texas invites private groups or persons to submit license-plate designs for consideration, but the state ultimately chooses what designs it wishes to adopt and which plates it wishes to manufacture for sale.[7] Also just as private monuments supplemented those placed by Pleasant Grove in its parks, the privately designed license plates supplement those designed by Texas itself.[8] The reasoning in Summum informs that if Texas license plates would constitute government speech if only Texas had designed the plates itself, they do not lose their governmental character just because Texas accepted a privately designed message, endorsed it, and then placed it on its plates.[9]
2.
Second, the Summum Court noted, 555 U.S. at 472, 129 S.Ct. 1125, that “[pjublic parks are often closely identified in the public mind with the government unit that owns the land,” a phenomenon that will cause jurisdictions to be selective in which images they choose to represent them:
[Parks] commonly play an important role in defining the identity that a city projects to its own residents and to the outside world. Accordingly, cities and other jurisdictions take some care in accepting donated monuments. Government decisionmakers select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local *406 culture. The monuments that are accepted, therefore, are meant to convey and have the effect of conveying a government message, and they thus constitute government speech.

Id.

Again, the same can be said of license plates: They are uniformly identified with the state governments that issue them. People see plates when driving on the highways and immediately will recognize and describe them as “Texas license plates.” Even specialty plates cannot exist but for the state’s cooperation and effort to manufacture and sell them.[10]
Unlike monuments, license plates broadcast an assoeiational image of the state on Texas vehicles wherever they may travel. And unlike monuments, license plates play an integral role in the most usual and rote form of interaction between a citizen and a state’s regulatory body: registering one’s vehicle. And also unlike monuments, there are no license plates that do not bear the name of the state of registration, directly imputing the state’s goodwill and reputation on whatever communication the plate bears.
License plates exist only because of state regulation. They are a method of effecting state vehicle registration regimes, at once sui generis and akin to drivers’ licenses, passports, currency, green cards, public school or military IDs, or others documents produced by virtue of a state regulatory regime. The association between license plates and a particular government, for that reason alone, could hardly be stronger.[11] It follows that the law allows Texas to choose whether it wishes its name to be associated with any criticism associated with the Confederate flag — whether it wishes the state to be linked to that flag wherever Texas cars are driven.[12]
3.
Third, the Summum Court, 555 U.S. at 474, 129 S.Ct. 1125, distinguished between the kinds of free speech rights usually occurring on public lands — “the right to speak, distribute leaflets, etc.” — and the monuments at issue. The “City ha[d] made no effort to abridge [Summum’s] traditional free speech rights,” so its followers could continue to go onto the park, speak, distribute literature, and presumably picket and hand out petitions. Id. Summum just could not erect fixtures on the park. What Summum really demanded, at bottom, was the city’s “adoption]” or “embrace” of its message. Id.
*407 The same can be said here. Texas does not prevent SCV from engaging in speech on its or its members’ vehicles in the same way that speech has traditionally been made: by license plate frames, bumper stickers, window stickers, window flags, or even painting cars with the Confederate flag. If SCV and its members can do all of those things, why is it seeking an order from a court compelling Texas to sell Confederate plates? The answer is the same answer in Summum: SCV seeks the kind of “adoption]” and “embrace” that comes with being on Texas license plates, with appearing next to the state’s flag, name, and likeness, and being given the kind of validation that follows from appearing on a state-issued license plate. It is precisely the reason that SCV wants to force Texas to produce these plates that it should be denied a court order doing so. Texas, like Pleasant Grove, cannot be forced to associate with messages it does not prefer.
The analogy applies in another important respect. Unlike pamphleteering, speeches, marches, picketing, and bumper stickers — all of which unquestionably involve private speech, even if they occur on government — owned property-erecting monuments and manufacturing specialty license plates both require the government’s assistance and complicity. That distinction, yet again, makes specialty plates more like park monuments and less like leafleting and bumper stickers.
C.
Although I have addressed the striking similarities between this case and Sum-mum, there are differences: The relationship between the cases is that of an analogy, not an identity. Even in light of every distinction proffered by SCV, the district court, and the majority, there is no principled basis to deviate from Summum.
1.
The majority opinion presents government-speech doctrine as a binary choice, as deciding whether the plates are “government speech or private speech,” and stating that “[i]f we conclude that the speech is private speech,” we then ask whether the state engaged in viewpoint discrimination. According to the remainder of the majority’s reasoning, if a reasonable observer would attribute the message on license plates to the driver, the analysis is over, and the speech is “private” as contradistinguished from “government” speech. That analysis presents a false dichotomy not present in Summum.[13]
In Summum, the overwhelming majority of the monuments were designed, built, and donated by private actors; and at least some portion (if not all) of the privately donated monuments bore the inscription, name, and/or written message of the donors, including the particular monument that Summum challenged as manifesting viewpoint discrimination. Because of the city’s selectivity in deciding which private messages to endorse, the Fraternal Order effectively had a venue that Sum-mum did not. The Court did not hold, however, that such was enough to trigger the protections of the First Amendment.
Indeed, the Court did not seem to find particularly relevant that when the city spoke, it had the company of private speakers. To the contrary, the Court repeatedly disavowed the relevance of the private aspects of the speech that Pleasant *408 Grove was adopting, emphasizing that a “government entity may exercise th[e] same freedom to express its views when it receives assistance from private sources for the purpose of a delivering a government-controlled message” as when it acts alone.[14]
Because Texas cannot constitutionally force its citizens to carry its message on their cars,[15] there will always be an element of private expression in specialty license plates — no matter their method of distribution or the author of their design— because the driver must have voluntarily chosen to accept a Texas plate. If an affected element of private speech is enough to foreclose application of government-speech doctrine,, then the majority’s reasoning reduces to this: Texas may not speak on its license plates. It is a false dichotomy to suggest, then, that either Texas is speaking or private citizens are speaking.[16]
The kind of association between Texas and its specialty license reflects the kind of association typical of advertisers and sponsors generally. When we attend a Houston Texans NFL game at its home stadium and see “Ford: the Best in Texas,” both the Houston Texans and Ford are speaking. Ford is saying it is the best in Texas; the Texans team is indicating that it is comfortable having its name, reputation, and goodwill associated with Ford and its products. And that association matters; endorsers and sponsors will engage or disengage with one another based on their mutual willingness to be associated with the other.[17]
In the end, Summum already tells us how to deal with the mixed quality of affected speech. There, as noted, the pri *409 vate designers and donors of the monuments often kept their own marks and included their own written messages with the monuments accepted by Pleasant Grove. In fact, the very monument that Pleasant Grove challenged as manifesting viewpoint discrimination bore the trademark of a private organization with a plaque containing a message that group had authored. By its facts, then, Sum-mum already teaches that government cannot be forced to associate with all viewpoints just because it chooses to associate with one.
The dictum in Summum describing other monuments suggests the same. The Court, apparently believing them to be obvious examples of government speech, discusses several monuments that have some elements of private speech, such as the Grego-Roman mosaic of the word “Imagine,” donated to New York in memory of John Lennon. See Summum, 555 U.S. at 474-78, 129 S.Ct. 1125, for several similar examples. Summum, it should be noted, was not remarkable in this regard. Every government speech case in which the government won (few as they are) has involved private participation and sometimes even concerned, as here, private dissemination.[18]
Finally, the state can engage in government speech despite the adoption and use of private speech in delivering its message, though no one would question the “mixed” association an observer would have on the message. In Chiras v. Miller, 432 F.3d 606 (5th Cir.2005), a pre-Summum case, we held that the state’s selection and use of textbooks in public schools constituted government speech, notwithstanding that the textbooks were unquestionably also the speech of their private authors. These cases reveal that the fact that an observer might also associate a message with a driver (as well as a private sponsor, such as SCV, for that matter) in addition to the State of Texas does not render the government-speech doctrine inapplicable.
The foregoing analysis also meets SCV’s argument that Maynard, which held, 430 U.S. at 717, 97 S.Ct. 1428, that New Hampshire could not compel drivers to carry “Live Free or Die” license plates, forecloses applying the government-speech doctrine.[19] Maynard was decided before *410 the Supreme Court announced the government-speech doctrine, so that was not at issue. Nevertheless, there is no tension between Maynard and the lessons to be drawn from Summum. Both compel us to conclude that speech on license plates is “mixed” insofar as it will be associated with both the state and the driver. Maynard informs us that, under the compelled-speech doctrine, the government may not force private speakers to disseminate its message in such a circumstance.[20] Sum-mum informs us that, under the government-speech doctrine, the government will not be forced to associate with all private messages just because it associates with some.
So, if Pleasant View were ordering Sum-mum to erect its monument with an inscription indicating its endorsement of the city, Maynard would say the city’s conduct is unconstitutional. But where SCV wants to force Texas to produce plates bearing messages with which it does not want to be associated, Summum tells us that Texas may permissibly refuse.
2.
The majority attempts to distinguish Summum on the ground that “this case does not present the unworkable system that the Supreme Court feared would be created ‘[i]f government entities must maintain viewpoint neutrality in their selection of donated monuments.’ ” For at least two reasons, that second proffered distinction is not a helpful basis for deciding this case.
First, the Court was well aware that content-neutral time, place, and manner restrictions could unquestionably handle every “practical” problem that would manifest itself if park fixtures were considered to create a forum. The Court explicitly rejected the invitation to decide the case accordingly. See Summum, 555 U.S. at 479, 129 S.Ct. 1125. Second, no other government-speech case[21] in which the government prevailed presented the kind of “practicality” problem that physical congestion presented in Summum. See, e.g., Livestock Marketing 544 U.S. at 555, 125 S.Ct. 2055 (involving television ads).
Physical congestion, then, is not and cannot be a talisman for finding government speech. Do we have any reason to think that Summum would have come out differently if instead of a 2.5-acre park, the city had a 25-acre park? I can think of none. Moreover, dictum from the Supreme Court explicitly assumed that monuments in NYC’s Central Park (which is 778 acres) would qualify as government speech for the same reason as did the park in Summum.[22]
For basically the same reason, it is no material distinction that there are 300 types of specialty license plates instead of 15 monuments. Do we have any doubt that Central Park could accommodate 300 privately donated fixtures if the city were inclined to accept them? I presume the argument is not that it would be surprising that the government would ever take positions on 300 topics; that would surely be wrong. At any rate, it would be impossible for us to derive a principle that Texas can speak on its own license plates without opening up a forum, but only if it resolves to associate with no more than X number of positions on Y number of topics.
*411 Perhaps the majority is alluding to a distinction offered by the district court that license plates do not take up “public space.” I assume what the court meant here is public real estate.[23] But that could not be relevant. Government messages on currency — the paradigmatic[24] example of government speech — similarly do not take up public “space.” Nor do other more obvious methods of speaking, such as press conferences at the Presidential podium, sense-of-Congress resolutions, or, to take a dramatic example of government speech, the Emancipation Proclamation.
Less dramatically but more relevant, neither Rust nor Livestock Marketing involved occupation of public real estate. Livestock Marketing, for its part, involved television and print ads, the former of which occupies “space” in no sense except the metaphorical. See Livestock Marketing, 544 U.S. at 555, 125 S.Ct. 2055. And Rust involved spoken and written words from physicians and hospitals to patients. See Rust, 500 U.S. at 179-80, 111 S.Ct. 1759. So, it cannot be the law that the government can speak without opening up a forum and can elicit private assistance in disseminating or even endorsing its message, but only where its actual speech is a fixture on real estate.
The caselaw makes the point well enough, and reason confirms its lesson. The irrelevance of an “occupied public real estate” distinction becomes apparent when we recall what aspect of the specialized license plates triggered the challenge here. No one disputes that if Texas designed its own license plates and compelled drivers to carry only those plates,[25] the government-speech doctrine would apply as clearly as it does to currency or passports. The only reason this case exists is because Texas lets drivers choose plates that were sometimes designed by private actors. Yet, we cannot say that one type of plate takes up “public space” but the other does not.
8.
The majority, like the district court, also attempts to distinguish Summum on the ground that license plates are not “permanent” as are the monuments. At first, this might appear to be a potentially important distinction until one realizes what the Court was explaining in Summum with its emphasis on monuments’ “permanence” and when one pursues the logical rigor of a rule based on something as relative a concept as “permanence.”
Although the Summum Court did repeatedly emphasize the permanent nature of the monuments, it had an obvious rhetorical purpose in doing so. Summum was arguing on appeal, with the aid of broad language from Supreme Court precedent, that public parks had been held since “time immemorial” to be a quintessential public forum, where state regulation of speech would be subject to the most exacting scrutiny. Because of that tradition, Pleasant Grove should not have been allowed to engage in what our jurisprudence would consider, along with prior restraints, to be the very worst form of speech restriction: viewpoint discrimination.
The Court responded that the kind of speech that courts had in mind when describing public parks in such lofty terms *412 did not include the installation of fixtures. See Summum, 555 U.S. at 478-79, 129 S.Ct. 1125. Rather, courts were considering things such as pamphleteering, giving speeches, canvassing, leafleting, demonstrations, and the like. So, when the Court emphasized the “permanence” of monuments, it does not appear to have thought that permanence qua permanence was significant but instead that that characteristic distinguished the kinds of speech that had already been held to be protected in public parks from the kinds of speech Summum wanted to engage in, which had never been held to be protected in public parks
That is the only understanding of Sum-mum’s discussion of “permanence” that accords with reason. We know that permanence cannot be significant in itself, because it is a relative concept that does not supply its own meaning, much less its own significance. Monuments, like license plates, can be removed and added over time.[26] More illustratively, the ads in Livestock Marketing were no more “permanent” than was the government speech on Texas’s license plates — perhaps less so, because television and radio ads are by their nature fleeting. See Livestock Marketing, 544 U.S. at 555, 125 S.Ct. 2055. Yet, that did not give the Court any pause in concluding that the ads in Livestock Marketing constituted government speech. And again, the quintessential forms of government speech (on currency, passports, and other traditional methods of speaking) do not suggest a kind of “permanence” that reveal the significance of that characteristic.
I do not take SCV to be arguing — as the plaintiffs in Summum were — that the putative forum in question is a traditional public forum,[27] like parks, in which the freedom of speech is at its apex. So, unlike the Court in Summum, we are not confronted with the difficulty of distinguishing kinds of speech in a particular forum and deciding whether all of those kinds of speech are similarly protected by our tradition.
IV.
In sum (pun intended), none of the differences between this case and Summum are differences in principle, and none offers a defensible justification for why Pleasant Grove City was entitled to a judgment in its favor in Summum but Texas is not so entitled here. The attempt to distinguish Summum ultimately devolves to manifesting a conclusion in search of a reason. However insignificant one might find the dispute before us, the law entitles Texas to a judgment in its favor. I respectfully dissent.

. The answer is that the reasonable observer may well have attributed the speech to both the Fraternal Order and the city. A fundamental error in the majority opinion is describing the government-speech doctrine as presenting a binary choice: government or private speech. As I explain, every government-speech case that resulted in a victory for the government- — including Summum — involved private participation in the relevant speech.

. In this court’s only post-Summum case dealing (briefly) with government speech, we, in dictum, stated that a city's financial support of certain street processions was insufficient to render it "government speech.” The key reason was that, though the city gave the parade organizers waivers from having to pay for cleanup, the city did not otherwise have any relationship with the procession’s message. See Int’l Women’s Day March Planning Comm. v. City of San Antonio, 619 F.3d 346, 360 (5th Cir.2010) (dictum; judgment affirmed on other grounds).

. Compare Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'n of Va. Dep't of Motor Vehicles, 288 F.3d 610 (4th Cir.2002) (coincidentally involving another division of the SCV); Arizona Life Coal. Inc. v. Stanton, 515 F.3d 956 (9th Cir.2008); Choose Life Ill., Inc. v. White, 547 F.3d 853 (7th Cir.2008); and Roach v. Stouffer, 560 F.3d 860, 867 (8th Cir.2009) (all holding government speech doctrine inapplicable) with ACLU of Tenn. v. Bredesen, 441 F.3d 370 (6th Cir.2006) (over a dissent, applying government speech doctrine to specialty plates).

. See Roach, 560 F.3d at 868 n. 3.

. I take it that SCV would not dispute this proposition, i.e., that this case exists only because Texas has decided not to force drivers to display plates that it designs on its own.

. See Tex. Transp. Code § 504.002(3) (“[T]he department is the exclusive owner of the design of each license plate.”).

. See 43 Tex. Admin. Code § 17.28(i)(8)(B) (providing the DMVB with "final approval authority of all specialty license plate designs”); 43 Tex. Admin. Code § 217.40 (detailing elaborate approval process for private vendor plate designs).

. See Tex. Transp. Code Ann. § 504.005.

. See also Summum, 555 U.S. at 471, 129 S.Ct. 1125 (“[W]hile government entities regularly accept privately funded or donated monuments, they have exercised selectivity.”); id. at 473 (“[T]he City has effectively controlled the messages sent by the monuments in the Park by exercising 'final approval authority’ over their selection.”) (quoting Livestock Marketing, 544 U.S. at 560-61, 125 S.Ct. 2055).

. See generally Tex. Transp. Code Ann. § 504.945(a).

. This analysis calls into question whether the majority is even applying its proffered test correctly. If a reasonable, informed observer knows all I have just described of Texas license plates, how could that observer not attribute the message to Texas?

. Cf. Sutliffe v. Epping Sch. Dist., 584 F.3d 314, 331-32 (1st Cir.2009) (applying Sum-mum where a town decided which hyperlinks it would post on its website). The majority’s contrary conclusion is largely ipse dixit, and I invite the reader to compare the reasons I have given for what would be an obvious association between a state and its license plates with the explanation given by the majority. The majority relies, in part, on Wooley v. Maynard, 430 U.S. 705, 716, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977), noting that "one of the reasons the state had asserted an interest in including [the challenged motto in that case]” was to "facilitate! ] the identification of passenger vehicles.” What the majority does not mention is that the other interest asserted by New Hampshire was to "promote!] appreciation of history, individualism, and state pride.” Id. So much for the putative novelty of Texas’s speaking on its plates. In any event, as I will explain, neither this dissent nor Sum-mum is in tension with Maynard, which involved a different First Amendment doctrine that addresses concerns different from those pressed by the plaintiffs here.

. See Andy G. Olree, Identifying Government Speech, 42 Conn. L.Rev. 365, 40010 (2009) (canvassing the growing awareness of the limits of this binary conception); see also Caroline Mala Corbin, Mixed Speech: When Speech Is Both Private and Governmental, 83 N.Y.U. L.Rev. 605 (2008) (proposing to apply intermediate scrutiny to so-called "hybrid” speech cases).

. See Summum, 555 U.S. at 468, 129 S.Ct. 1125 (citing Livestock Marketing, 544 U.S. at 562, 125 S.Ct. 2055; Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995)); see also id. at 470-71, 129 S.Ct. 1125 (“Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land.”); id. at 472, 129 S.Ct. 1125 ("Although many of the monuments were not designed or built by the City and were donated in completed form by private entities, the City decided to accept those donations and to display them in the Park.”); Livestock Marketing, 544 U.S. at 562, 125 S.Ct. 2055 (stating that where the government controls the message, "it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources”); Rosenberger, 515 U.S. at 833, 115 S.Ct. 2510 (opining that a government entity may “regulate the content of what is or is not expressed ... when it enlists private entities to convey its own message”).

. See Maynard, 430 U.S. at 717, 97 S.Ct. 1428 (ruling that New Hampshire could not force Quaker to bear license plate with the phrase "Live Free or Die,” the state motto).

. See Joseph Blocher, Government Property and Government Speech, 52 Wm. & Mary L.Rev. 1413, 147980 (2011) (“The unavoidable implication is that the expression emanating from specialty license plates is both governmental and private.... [A] reasonable observer would probably conclude that both the owner of the vehicle displaying the plate and the state government that authorized it support the plate's message.”).

. Cf. Texas v. Knights of the Ku Klux Klan, 58 F.3d 1075 (5th Cir.1995) (upholding exclusion of the KKK from Texas’s Adopt-a-Highway program, though describing the prohibition as "viewpoint-neutral”). Justice Stevens, who, like Justice Souter and the panel majority, would prefer a "reasonable observer test,” does not fail to appreciate this. See Summum, 555 U.S. at 481, 129 S.Ct. 1125 (Stevens, J., concurring) (“While I join the Court’s persuasive opinion, I think the reasons justifying the city's refusal would have been equally valid if its acceptance of the monument, instead of being characterized as 'government speech,’ had merely been deemed an implicit endorsement of the donor’s message.”) (emphasis added).

. See Livestock Marketing, 544 U.S. at 555, 125 S.Ct. 2055 (finding government-speech doctrine applicable despite that a board of private beef growers managed and produced the relevant promotional campaigns and that the promotional materials were ostensibly associated with said private producers, where the Agriculture Secretary approved all messages before they were disseminated; the advertisement also ran on private newspapers and television stations); Rust, 500 U.S. at 192-95, 111 S.Ct. 1759 (upholding use of private physicians and hospitals to disseminate government's policy encouraging live birth); Sutliffe, 584 F.3d at 329-35 (Town setting up and controlling a town website, choosing which third-party hyperlinks it would allow; describing Summum as “mak[ing] it clear that when the government uses its discretion to select between the speech of third parties for presentation through communication channels owned by the government and used for government speech, this in itself may constitute an expressive act by the government that is independent of the message of the third-party speech”); Downs v. L.A. Unified Sch. Dist., 228 F.3d 1003, 1011 (9th Cir.2000) ("While these faculty and staff members may have received materials from outside organizations, the faculty and staff members alone posted material on the bulletin boards, and at all times their postings were subject to the oversight of the school principals.”); Newton v. LePage, 789 F.Supp.2d 172, 184 (D.Maine 2011) (private artist commissioned by state to paint a pro-labor mural); Page v. Lexington Cnty. Sch. Dist. One, 531 F.3d 275, 282 (4th Cir.2008) (school board circulating communications by private individuals in support of board’s position that particular piece of legislation be voted down).

. The panel majority did not rely on Maynard, but I address it because it was urged by SCV.

. See also W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).

. The exception is Newton v. LePage, 789 F.Supp.2d 172, 185 (D.Maine 2011), which involved a mural inside a state building's anteroom.

.See Summum, 555 U.S. at 474-75, 129 S.Ct. 1125 (discussing the John Lennon memorial in Central Park).

. That is because license plates do take up physical, though noncontiguous, space, and it would presumably be financially impracticable to have an infinite number of license plates.

. See Carl G. DeNigris, When Leviathan Speaks: Reining in the Government-Speech Doctrine Through a New and Restrictive Approach, 60 Am. U.L.Rev. 133, 135 (2010).

.Perhaps with a blank option to satisfy Maynard, 430 U.S. at 717, 97 S.Ct. 1428 (stating that the state could not force Quaker to bear license plate with the phrase "Live Free or Die,” the state motto).

. See, e.g., Newton (applying government-speech doctrine to a governor’s removal of a large, wall-sized mural depicting Maine’s labor history from lobby of government building; the mural had been in place for three years). Many of the statutory specialty plates in Texas have been around for over ten years. See, e.g., Registration of Vehicles and the Issuance of License Plates by the Texas Department of Transportation; Providing Penalties, 2003 Tex. Sess. Law Serv. ch. 1320 § 6 (H.B. 2971) (Vernon's). Does that connote less "permanence” than does a removable fixture?

. The majority curiously attempts to distinguish Summum on the ground that license plates — unlike parks — are not traditional public forums. But that surely cuts in the opposite direction. Traditional public forums are where speech restrictions are most strictly scrutinized. The fact that parks had been held since "time immemorial” to be places of public speech was a hurdle for the city in Summum. That is, the city won in Summum despite the fact that public parks are traditional public forums, not because they are public forums.